[No. 15028.   Department Two.   July 8, 1919.]

Marion Coldeen, *Respondent*, v. George L. Reid,
*as Sheriff of Spokane County, et al., Appellants.*[1]

Sheriffs and Constables (36)—Wrongful Killing—Action on
Bond—Evidence—Sufficiency. In an action on a sheriff's official
bond for the wrongful death of a person shot by a deputy sheriff
in attempting to make an arrest, evidence warranting a finding
that deceased met his death from a shot from the deputy's revolver
under circumstances affording no justification, makes a question
for the jury, notwithstanding that it was directly opposed by
defendant's evidence.

Same (36)—Wrongful Death—Evidence—Admissibility. In an
action on a sheriff's official bond for the wrongful death of a person
shot by a deputy sheriff in attempting to make an arrest, defendants
are entitled to show the officer's belief that deceased was committing
a felony, where there were sufficient facts to make it a question for
the jury whether or not the officer had reasonable ground to believe
that the deceased was in the act of committing a felony.

Arrest (6)—Authority—Force—Misdemeanor. In attempting to
make an arrest for a misdemeanor, police officers have no warrant
to maim or kill a person who attempts to escape.

Appeal (140)—Exceptions—Exclusion of Evidence. Under Rem.
Code, § 385, no formal exception is necessary to the ruling of the
court rejecting evidence.

Same (142)—Exceptions—To Instructions. No exception to the
refusal to give an instruction is necessary to preserve an objection

[1]Reported in 182 Pac. 599.

to the exclusion of evidence after objections and ruling made at the trial.

SAME (142).  After error in refusing to give a requested instruction, exceptions to the instructions given are not necessary to preserve the question.

NEW TRIAL (34)—GROUNDS—NEWLY DISCOVERED EVIDENCE.  Where plaintiff's evidence was self-contradictory, and there was serious room for doubt, a new trial should be granted, upon disclosing supporting evidence which could not, with reasonable diligence, have been discovered before the trial.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered January 21, 1918, upon the verdict of a jury rendered in favor of the plaintiff, in an action for wrongful death.  Reversed.

*John B. White, Joseph B. Lindsley,* and *Fred J. Cunningham,* for appellants Reid *et al.*

*Merritt, Lantry & Merritt,* for appellant National Surety Company.

*Roy A. Redfield,* for respondent.

FULLERTON, J. — The respondent, as the widow of one Harvey Coldeen, brought this action against the appellants, Reid, Bradley and the National Surety Company, respectively, sheriff of Spokane county, deputy sheriff of that county, and surety on the sheriff's official bond, to recover in damages for the alleged wrongful killing of Coldeen by the deputy Bradley.  There was a recovery in the court below, and the appeal is from the judgment entered.

The evidence as to the facts surrounding the transaction is strangely in conflict.  According to the testimony of a young man who was with Coldeen at the time he was found dead, he met Coldeen at a pool hall, in the city of Spokane, at about half past eleven o'clock on the evening of the day before Coldeen met his death.  They played pool at this place until about mid-

night, when they went to a restaurant for lunch. They stayed in the restaurant for some time, finding, on reading the time sheet, that the last street car for the night, going in the direction of Coldeen's home, had gone. Coldeen then suggested that they go down the street and find an automobile in which the witness could drive him home. They started on this quest, finding and examining several which they could not operate because of the precautions the owners had taken against possible theft, finally finding one they could operate standing in front of a garage. This car they got into, and started in the direction of Coldeen's home. On the way, at whose suggestion the witness does not remember, they changed their course, concluding to go to a dance held that night at a place called Colbert, some miles distant from and north of Spokane. On the way to Colbert they drove rapidly, overtaking and passing a car containing four persons. Shortly after passing the car, it came up alongside of them, when one of its occupants flashed a flashlight over them. Thinking this a challenge for a race, and at the suggestion of Coldeen to speed up as they could outrun the other car, he speeded up and was pulling away from the other car, when a shot was fired by one of its occupants. He then slowed down the speed of the car, when the other car passed him and likewise slowed down. He then again increased his speed and was again passing the other car, when another shot, or perhaps two in rapid succession, he was uncertain which, were fired by the occupants of the car. He then slowed down, turning his car into a bank on the side of the road, when he was arrested by the occupants of the other car, who proved to be deputy sheriffs. He then, for the first time, discovered that Coldeen was dead. He did not hear Coldeen speak after the first shot was fired. When the car stopped

against the bank, he says Coldeen was sitting almost upright in the car, with his head leaning to one side, with fresh blood oozing from his mouth and nostrils and from a wound on the back of his head.

The story of the officers is that they were likewise on the way to Colbert, having been directed to go there by the sheriff because of information of lawless conduct by some of the attendants at a dance held at that place. When the car driven by the former witness overtook them, it was proceeding at a very rapid rate of speed; that, as it approached, they noticed there was no license plate on its front, and when it passed them, they noticed there was none on its rear; that the deputy Bradley then directed the driver of their car to overtake them; that the driver did so, and as their car came alongside of the other, Bradley stood out on the running board, exhibited his badge as a deputy sheriff, flashed his flashlight in front of the occupants of the car and shouted "halt"; that the car, instead of stopping, increased its speed, and as the rear wheel came opposite him he fired into the tire of the wheel; that the car then slacked up, their car passing it and also slowing up and pulling in towards the center of the road; that the other car then again speeded up and passed them on the left, when Bradley again fired at the other rear tire, firing over the hood of the motor of the car in which he was riding; that the car then slowed up and turned toward a by-road leading away from the main highway, but missing it, ran against a bank on the side of the road, where it stopped. The officers then discovered that Coldeen was dead, and placed the other party under arrest. Seemingly, they then made no particular examination of the body of Coldeen. They say the lower part of his face was covered with coagulated blood, and that the wound on the back of his head had the appearance

of having been made with a blunt instrument. The body was covered with a blanket or robe and left in the car while the sheriff was called to the place by telephone.

The sheriff, the coroner and an undertaker arrived at the place soon after. It was then discovered that Coldeen died from a bullet wound; that the bullet entered his head a little to the left of the median line at the junction of the occipital and parietal bones, passed through the brain substance in a slightly upward course and lodged on the frontal bone of the head, fracturing it both perpendicularly and transversely. The body of Coldeen was found in a sitting posture, substantially as described by the driver of the automobile. It was removed from the car and, as they testify, a minute and careful examination made of the car by the sheriff, four of his deputies who were present, and by the coroner. Each of them testify that it bore no marks of bullets discoverable, save in the tires of the rear wheels, both of which were then deflated and showed punctures such as would be made by firing into them with a revolver. The rear tires were taken from the wheels at the direction of the sheriff and carried away by him. The car was then removed to a by-road and left standing for a few hours, when it was removed to a garage at Hilliard by the direction of the sheriff.

The sheriff also testifies that, after hearing the statements of his deputies as to the number of shots that had been fired by them, he examined the revolvers carried by them, and found that none of them had been fired except Bradley's, and that there were two empty shells only in the revolver carried by him.

The bullet taken from Coldeen's head was much distorted and battered, and weighed twenty-two grains less than the manufacturer's statement of the weights

of the bullets used by Bradley, and twenty-two grains less than one taken from Bradley's gun after the shooting.

The principal conflict in the testimony is over the condition of the car at the time it was examined by the coroner and the sheriff and his deputies. The back curtain of the car was introduced in evidence. It contains two holes, such as could have been made by bullets. Both are below the isinglass window of the curtain, one some three and one-half inches and the other seven inches to the left of the center of the curtain. The holes are four and one-half inches apart, and, when measured from the bottom of the curtain, one is three inches higher than the other, the one farthest from the center being the higher. The lower one is possibly two inches above the back of the cushioned seat of the automobile, and the other, of course, some five inches above it. They are plainly visible, even at a casual glance, at a point several feet distant. Photographs taken of the car some days after the shooting show them plainly. Four witnesses testtifying for the respondent say they saw the holes in the curtain while the car was standing at the place where it was left by the sheriff immediately after the shooting, and four others testify that they saw them in the afternoon of the same day, after the car had been removed to the Hilliard garage at the direction of the sheriff. We have called attention to the evidence of the coroner, the sheriff and his deputies as to the condition of the car at the time they left it, after taking Coldeen's body from it and removing the rear tires. While on the witness stand they emphatically testified that the holes were not in the curtain at that time. The sheriff further testified that the first time he learned of the holes in the curtain was

17—107 WASH.

after the coroner's inquest on the body of Coldeen, some days after the shooting. He says that a rumor reached him to that effect and that he went to the Hilliard garage to examine the car; that the holes then appeared as they now appear, and no one could overlook them.

The respondent offered the testimony, also, of parties living in the vicinity of the highway near where the shooting occurred. Three of these testify that they heard the racing cars and the shots from the revolver. They testify that there were three shots, following each other in reasonably rapid succession, such, the record recites, as one—two—three. One of them, however, testifies positively that the racing cars were going south, in the opposite direction from the direction these cars were actually traveling. Another, while not so positive, thought they were going south. Still another testifies to but two shots, both fired in rapid succession and at the time of the first meeting of the cars on the highway. The person whose telephone was used by Bradley testified that Bradley, while telephoning to the sheriff immediately after the shooting, made a statement indicating that he had killed one of the occupants of the car. This witness was one of the four witnesses who examined the curtain of the car before it was removed to Hilliard and who testified that it then bore the marks of the bullets. His statement concerning what Bradley said in the telephone conversation is denied by the sheriff.

At the conclusion of the plaintiff's case, the defendants interposed a challenge to the sufficiency of the evidence. The challenge was overruled, whereupon the defendants introduced evidence on their own behalf. At the conclusion of all of the evidence, the challenge was renewed, and after the return of the verdict, a motion for judgment notwithstanding the

verdict was made. The challenge and motion being overruled, the defendants moved for a new trial on all of the statutory grounds, supporting their motion by affidavits.

The first contention of the appellants is that the evidence is insufficient to justify the verdict. This question, we think, requires no extended discussion. If the jury believed the evidence of the respondent's witnesses, they were warranted in finding that the deceased met his death from a shot from the deputy sheriff's revolver, under circumstances which afforded no legal justification. The jury could have found that the deceased and the person with him in the automobile were committing a misdemeanor only, and that the deputy deliberately fired at them because they refused to stop at his command. It is true that the evidence from which such a conclusion is reached is not entirely consistent with other evidence introduced by the respondent and is directly opposed by the testimony of the sheriff, his deputies, the coroner, and the supporting witnesses of the sheriff; and it is true, also, that such a conclusion cannot be reached without the finding that the sheriff, his deputies and the coroner committed deliberate and willful perjury; but the question was one for the jury nevertheless, and one upon which their findings are conclusive upon the court. It is perhaps unnecessary to add that police officers, in making an arrest, have no warrant to act oppressively, or to wantonly injure the person they attempt to arrest, or to maim or kill a person who attempts to escape from arrest, when the offense committed is a mere misdemeanor.

The second contention of the appellants is that the court erred in the exclusion of evidence. On the trial of the case the deputy sheriff, in answer to questions put to him by the appellants' counsel, was proceeding

to state his belief as to the character of the offense the deceased and his companion had committed, stating that their conduct had led him to believe that the car had been stolen. On objection, the trial court withdrew the statement from the consideration of the jury, and refused the offer of further evidence to the same effect. In its instructions, also, the court charged the jury on the theory that the offense committed by the deceased and his companion was a misdemeanor only, charging in effect that the deputy was not justified in shooting at the occupants of the automobile, ''whether they understood or did not understand that Bradley was an officer, or even if they were attempting to escape from arrest,'' and refusing a request to charge on the theory that the offense committed was a felony.

In rejecting the proffered testimony and in refusing to charge as requested, we think the court was in error. In this state, where the common law rule prevails, a police officer is justified in making an arrest when he has reasonable ground to believe, and does believe, that a crime is being committed, and, having the right to make the arrest, he has the right to use that degree of force the circumstances of the case warrant; that is to say, if the crime is a misdemeanor, he may use the force the law permits in making arrests for misdemeanors; and if it be a felony, he may use the force the law permits in making arrests for felony. When, therefore, an officer is called upon to answer for a claimed unlawful arrest, or for excessive use of force in making a lawful arrest, he has the right to show the circumstances surrounding the transaction, and the impression these circumstances make on his mind, and to have the jury charged on his theory of the case; unless, of course, the circumstances were such that there could be no two opinions concerning it. Here there was sufficient facts to make it a question

for the jury whether or not the officer had reasonable ground to believe the deceased and his companion were in the act of committing a felony, and, in consequence, was entitled to show what impression these facts made upon his mind. It was error, therefore, to exclude the proffered testimony.

We are met, however, with the contention that the appellants have not properly preserved the objection in the record, since no exception was taken either to the court's ruling rejecting the evidence, or to his refusal to charge as requested. But no formal exception is necessary to the ruling of the court rejecting the evidence (Rem. Code, § 385), and no exception to the refusal to give an instruction upon the question was necessary to preserve the objection. *Nelson v. Western Steam Nav. Co.*, 52 Wash. 177, 100 Pac. 325. Nor was an exception to the instruction actually given necessary for that purpose. These are unobjectionable upon the court's theory of the case, and after the opposing party had met with one rejection of his own theory, it was not necessary in order to preserve the question to pursue the matter throughout the trial.

We think further that the court might well have granted a new trial on the ground of newly discovered evidence. After the trial, the appellants were able to gather some new evidence directly supporting their theory of the case, and much that supported it inferentially. The trial court seems to have denied the motion because the directly supporting evidence was cumulative, and because the other was in a large measure overcome by the counter affidavits filed. But while the rule applied is appropriate in an ordinary case, this case, we think, presents questions unusual in cases of its character. As we have attempted to show, the evidence introduced by the prevailing party is in a manner self-contradictory and cannot all be true, not

in the sense that perjury was committed by the witnesses, but because they were not in a position to observe or hear accurately, and could receive wrong impressions. But no such condition confronts the officers of the law. With them there is no room for mistake. They either told the truth or they committed deliberate and willful perjury. The finding of the jury that the latter was the fact is more serious to them than is the money element involved, and where there is such serious room for doubt and supporting evidence is discovered which could not, with reasonable diligence, be discovered before the trial, we think it but just that a new trial be granted.

The judgment is reversed and a new trial awarded.

MAIN, MOUNT, and PARKER, JJ., concur.

HOLCOMB, C. J., concurs in the result.