THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN SCALISI *et al.* Plaintiffs in Error.

*Opinion filed December 23, 1926.*

1. CRIMINAL LAW—*when evidence tending to show fraud in procuring automobile license is not admissible in a murder trial.* Where defendants are charged with the murder of a policeman, who attempted to arrest them without apparent cause while they were riding in an automobile, evidence tending to show that the party to whom the license for the car had been issued mis-stated his residence is not competent, where there is no evidence tending to show that the defendants had any connection with the car other than riding in it upon the occasion in question.

2. SAME—*when evidence of criminal reputation of companion is not admissible against the defendants.* Where defendants are charged with the murder of a policeman, who attempted to arrest them without apparent cause while they were in an automobile of a companion who had invited them to ride, evidence that the companion, who was killed in the encounter with the officer, had been indicted upon other occasions and had forfeited his bonds and was well known to the police is not admissible against the defendants, where there is no evidence that either of them ever knew anything about the charges against their companion.

3. SAME—*defendants are entitled to have jury instructed as to law applicable to any state of facts shown by evidence.* A defendant is entitled to the benefit of any defense shown by the entire evidence even if the facts on which such defense is based are inconsistent with the defendant's own testimony, and defendants in a murder trial are entitled to have the jury instructed not only as to the law applicable to the state of facts testified to by them, but applicable to any state of facts which the jury may legitimately find to have been established by the evidence.

4. SAME—*authority of the police to arrest without a warrant.* While policemen were unknown to the common law they are generally considered as having the same powers as watchmen and constables, but under paragraph 681 of the Criminal Code their authority to arrest without a warrant is greater than at common law in that they are authorized to make arrests for misdemeanors as well as felonies, where they have reasonable ground for believing that the person to be arrested has committed the offense.

5. SAME—*what constitutes reasonable ground for making arrest without warrant.* To justify an officer in making an arrest without a warrant his ground for belief that the person to be arrested is guilty of a crime must be such as would influence the conduct of a prudent and cautious man under the circumstances.

6. SAME—*officer cannot use deadly weapon to make arrest for misdemeanor except in self-defense.* While an officer, generally, may use a deadly weapon, even to the extent of taking life, if necessary to effect the arrest of a felon, for the reason that the safety of the public is endangered while the felon is at large, the rule is that except in self-defense an officer may not use a deadly weapon or take life to effect an arrest for a misdemeanor, whether his purpose is to kill or merely to stop the offender's flight; and this is true even though the offender cannot be taken otherwise.

7. SAME—*false imprisonment consists of any confinement or detention without authority.* To constitute false imprisonment it is not necessary that the person guilty thereof shall use physical violence or lay hands on the person falsely imprisoned or confine him in jail or prison, but it is sufficient if at any place or time he without lawful authority in any manner restrains such person of his liberty or detains him in any manner from going where he wishes or prevents him from doing what he desires.

8. SAME—*extent to which party may resist illegal arrest—manslaughter.* Whether a party is guilty of any offense when he kills another who attempts to arrest him unlawfully depends upon the circumstances, and while a party has no right to resist an officer to the extent of taking life where the officer attempts to arrest him without color or authority of law, the killing, in most cases, can constitute manslaughter, only, unless malice is shown.

9. SAME—*distinction between express and implied malice.* Express malice is that deliberate intention to take life when manifested by external circumstances capable of proof, and malice is implied when no considerable provocation appears but all the circumstances of the killing show an abandoned and malignant heart, the distinction being that in the one case malice is shown by facts outside of the homicide itself, while in the other the malice is inferred from the act or manner of committing the homicide.

10. SAME—*when defendants are entitled to instructions as to right to resist unlawful arrest and as to manslaughter.* Where defendants are charged with the murder of a policeman who attempted to arrest them without apparent cause, and the peculiar circumstances of the case involve the rights of officers to make arrests with a deadly weapon and no express malice is shown by the evidence, the defendants are entitled to instructions as to the

rights of officers in making arrests, the right of a citizen to resist unlawful arrest, the distinction between murder and manslaughter, and as to the form of verdict for manslaughter.

DeYOUNG, J., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM V. BROTHERS, Judge, presiding.

PATRICK H. O'DONNELL, and THOMAS D. NASH, (MICHAEL J. AHERN, of counsel,) for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and MERRILL F. WEHMHOFF, (GEORGE E. GORMAN, EDWARD E. WILSON, and CLARENCE E. NELSON, of counsel,) for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

Plaintiffs in error, John Scalisi and Albert Anselmi, were in the criminal court of Cook county convicted of the murder of Harold Olson and were sentenced to imprisonment in the penitentiary for the term of fourteen years. The record of the cause is now before this court for review upon writ of error.

Albert Anselmi, forty-three years of age at the time of the trial, was born in Marcella, Sicily, and first came to America in 1913. He resided in the State of New York until the latter part of 1921 when he returned to Italy, where he remained until November, 1924, at which time he came to Chicago and engaged in the cheese and oil business, in which business he continued until June 13, 1925. His knowledge of the English language was limited and his examination as a witness was conducted with the aid of an interpreter. So far as this record shows, prior to June 13, 1925, he had never been charged with any criminal offense and was a man of good reputation. Plaintiff in error John Scalisi, aged twenty-seven years, was born in Sostraintriano, Italy, and came to America about four and one-

half years ago. He first resided at St. Louis, Missouri, and afterwards came to Chicago, where on June 13, 1925, and for some time prior thereto, he conducted an Italian restaurant at 1014 South Halsted street. So far as this record shows, prior to June 13, 1925, he had never been charged with any criminal offense and was a man of good reputation. In the morning of June 13, 1925, he went to a barber shop at Taylor street and Blue Island avenue, where he met Anselmi. While they were there Mike Genna came up in a Cadillac car and Anselmi went out to talk to him. Genna asked him if he wanted to take a ride, and he also called Scalisi and asked him if he wanted to take a ride. Scalisi and Anselmi got in the rear seat of the car, and, with Genna driving, at about nine A. M. they started to go to the residence of Tony Genna, a brother of Mike. They went west on Taylor street to Ogden avenue and thence to Western avenue, upon which they proceeded south almost to Sixtieth street. When Scalisi and Anselmi got in the car they saw four or five shot-guns and three revolvers on the floor of the car. Genna told them why the guns were there, but Scalisi and Anselmi were not allowed to testify as to what Genna told them on that subject. Their attorney offered to prove that Genna said that he had been informed by a friendly police officer that a raid was being planned upon the Italian-American Club, in which the guns were, and that he had been informed by the police officer that it would be well for him to get the guns out of there, and with that in mind he had them in the car and was taking them out to the home of his brother, Tony, who lived in the vicinity of Fifty-sixth street and Western avenue. The State's attorney objected and plaintiffs in error were not allowed to make this proof. Each plaintiff in error testified that he did not own any of the guns and that of his own knowledge he did not know whose guns they were; that he had no information from any source that he was wanted for any offense by the police of Chicago at the

time he got into the automobile; that he had no reason to believe that the police of Chicago might want to arrest him; that the guns were not in the car for the purpose of resisting police officers if they should attempt to arrest him, and that he did not on June 13, 1925, or before, have any malice, ill-will or hatred toward police officers as a class.

About nine o'clock in the morning of June 13, 1925, four police officers of the city of Chicago, Harold Olson, Charles Walsh, William Sweeney and Michael Conway, comprising a police automobile squad, were cruising about in the neighborhood of Forty-seventh street and Western avenue in a seven-passenger Paige touring car, equipped with a large brass bell located on the running-board near the right front fender, and painted dark blue,—the same color as the car. The bell, when rung, was manipulated by a cord leading from the right front seat, where the squad leader, Conway, sat. To the left of Conway, and driving the car, was the deceased, Harold Olson. In the rear seat were Sweeney and Walsh. A rack in the tonneau, fastened to the back of the front seat, held two repeating Marlin single-barreled pump-guns, the magazine of each loaded with five 12-gauge shells. The chokes of these guns were cut off or left out in manufacture and on that account they were known as riot guns, or sawed-off shot-guns. While going north on Western avenue, about 400 feet north of Forty-seventh street, the squad car met Genna's Cadillac touring car, going south. When the squad car had gone about 100 or 200 feet further north, Conway, the squad leader, directed Olson to turn the car around and follow the Cadillac car to see who the men were who were in it. Conway testified that the only reason for following them was out of curiosity, and that outside of the fact that the car was a Cadillac, with these men in it at that time in the morning, there was nothing about the Cadillac which attracted the attention or suspicion of the police squad. When

the cars met they were each going about ten miles an hour. After the squad car got south of Forty-seventh street the Cadillac started to go faster. Up to Fifty-fifth street, a mile south of Forty-seventh street, the greatest speed which the Cadillac had attained was 35 to 40 miles an hour, the squad car gaining on it. A short distance north of Sixtieth street the Cadillac car swerved to one side, as Conway testified, as if the driver had lost control, and it either skidded or was backed up over the west curb and came to a stop with its rear end over the parkway and the front facing northeast. The squad car continued south past it for about twenty-five feet and then turned around toward the Cadillac, stopping with its front portion facing northwest,—a distance variously estimated at from seven to twenty-five feet from the right side of the Cadillac. The four policemen and the occupants of the Cadillac got out of their respective cars at about the same time. The police were not in uniform. Conway wore a pepper-and-salt suit, a straw hat, a white shirt with a red stripe in it, with collar to match, and a black tie. Sweeney wore a dark suit and a dark cap. Walsh wore a brown suit, cap, tan shirt, and a soft turned-down collar to match. Olson wore a blue suit, cap, and a white shirt and collar. All of the police were cleanly shaven except Sweeney, who needed a shave. Conway testified that Sweeney had a shot-gun in his hands in the car from about Fifty-first street; that he had the stock under his arm alongside his waist, with the barrel down to the floor; that when they were just past Fifty-first street he looked around and told Sweeney to get the shot-guns ready; that at that time he did not know that the men had any guns in the Cadillac car; that he had his revolver ready for use at Fifty-first street; that when the squad got out of the car he saw Walsh walk to the rear of the Cadillac with a shot-gun in his hand; that when Sweeney stepped out of the car he, too, had a shot-gun in his hand; that Walsh approached the rear of the Cadillac car with the

muzzle of the gun pointed in its direction; that he thinks Walsh had his hand on the trigger; that he (Conway) held his gun alongside of him, pointed downwards; that Walsh had his shot-gun leveled all the time as he approached from the Paige car and while he was going over to the Cadillac; that Walsh and he were in the lead as they approached the Cadillac and Olson was a few feet behind them; that when they were about a foot away from the wind-shield of the Cadillac, Olson and he at the same time said they were police officers; that the gong on the police car had been rung continuously for some time prior to stopping; that when he stepped out of the car he rang the gong; that when they were three feet away from the car they said they were police officers two or three times; that as they approached they saw no guns in the hands of any of the men in the Cadillac; that he was about a foot away from the wind-shield of the Cadillac before he saw any guns; that as they got to the Cadillac, Anselmi was down in a crouching position with a shot-gun; that he heard a blast from Anselmi's gun and Walsh fell dead; that Scalisi was down in a crouching position, and that he heard a blast from his gun and Olson fell dead; that Genna was still standing alongside the car with a shot-gun in his hand, which he clicked a couple of times, whereupon witness fired and then ran and got behind the hood of the Paige car; that Scalisi came around the rear of the Cadillac and fired two charges out of a double-barreled shot-gun right at the Paige; that he (Conway) was shot on the side of the ear and in the head; that he met Sweeney in back of the car and told him to stand up and fight; that he re-loaded his revolver; that Genna came out in front of the Cadillac with a shot-gun and fired two charges at him; that witness ran toward him and fired a couple of shots, and Genna ran back of the Cadillac, behind the hood of the engine; that their shot-guns were over the side of the car and no heads were visible; that a blast came from them and witness got down

again; that after he got up there was another volley and witness got shot over the heart; that he kind of staggered, added five more bullets to his gun and came up again; that he saw two men pass to the rear of their car and Genna still stood there at the left-hand side with the shot-gun right at him; that witness crossed over to Olson, and as he got about ten feet from the Cadillac Genna came out and they faced each other and witness fired at Genna, who jumped and ran down the prairie; that witness followed; that at his third shot Genna went down to one knee, clapped his leg, looked around and then got up; that witness followed and emptied his revolver at him, and he turned in the alley and went into a yard at 5941 Artesian avenue; that witness then came back to Western avenue and was taken in an automobile to a hospital; that at the time of the pursuit the men in the Cadillac were unknown to the members of the squad; that the latter knew of no felony or misdemeanor the men in the Cadillac might have committed; that the police had no warrant or process of law for their arrest or apprehension and had no knowledge that any one of them was a fugitive from justice; that when his squad pulled up to where the cars finally came to a stop, and as he was getting out of the car and started to approach the Cadillac, it was his purpose and intention to interrogate the men in the Cadillac car and at that time to detain them for a length of time until satisfied as to who they were; that at the time he turned around and followed the Cadillac car it was his intention to stop them and find out who they were and detain them long enough to question them; that he formed that intention the moment he turned around to go after them. Conway testified that he fired altogether eighteen or twenty-four shots.

Police officer Sweeney gave substantially the same account as Conway of the pursuit of the Cadillac by the squad car except that he testified that Conway gave no orders around Fifty-first street for the officers to pick up their guns

and have them ready for use, and that he did not then have a shot-gun with the stock of the gun under his arm and the barrel pointing toward the floor, as stated by Conway, but he did state that while going down the street the guns fell out of the rack and that he remembers holding one on the side, and that Walsh took one of the guns which was bouncing and fell out and laid it alongside of him. His account of the battle after it started differs considerably from that of Conway as to detail but not as to any material point. He testified that as soon as he heard the first shot and saw Walsh fall he grabbed his revolver and went to the rear of the Paige; that up to the time Walsh was shot none of the officers had fired any shots; that when he got to the rear of the Paige the first man he saw after Scalisi was Anselmi, who came around the south side of the Cadillac with a long-range pump-gun and fired four shots in succession; that witness fired three shots and Genna jumped back and got to the rear of the Cadillac; that Scalisi and Anselmi came out to the side of their car at several different times as though they were trying to get back into the car again, and that witness fired as they came out and they would then run back to the rear of their car; that they did this for probably three or four minutes; that finally they backed up to the sidewalk, each with a double-barreled shot-gun in his hand, and then all of a sudden they turned and ran west through the prairie, each carrying his gun; that witness saw them run all the way to the alley; that Genna remained back of the Cadillac car, still shooting; that when Scalisi and Anselmi were more than half-way through the prairie Genna backed up to the sidewalk and turned around and followed them; that witness then ran out from the right side of the Paige car in the rear and grabbed Olson's gun from his holster; that witness pursued Genna and the other two through the prairie, firing at them; that he emptied his gun, the last shot being fired in an alley while Genna was going through the yard at 5941

Artesian avenue, at which place Genna broke a window with his gun and jumped into the basement. Conway testified that when Genna ran across the prairie he started chasing and shooting at him; that he did not see Sweeney and did not know where he was; that no one was shooting behind him and he was the only one shooting at Genna; that after running some distance through the prairie he came back to Western avenue. There is evidence tending to show that Sweeney did not follow Genna across the prairie but went down Western avenue to Sixtieth street and down that street to the alley and did not arrive at 5941 Artesian avenue until Genna had been captured by other officers. Neither Scalisi nor Anselmi was shot and Genna was hit by only one bullet, which severed the femoral artery, causing his death. Sweeney testified that when Olson got out of the Paige car he did not carry anything with him and that when he picked up Olson's gun no shots had been fired from it. A newspaper man who conducts a column in the *Herald-Examiner* under the title "This Our Chicago," and who formerly conducted "The Line O'Type" in the *Tribune,* testified that on June 13, 1925, in the local room of the *Herald-Examiner* office, while he was writing a feature story about Sweeney, Sweeney stated to him that he remembered that Olson had fired only two shots with his six-shooter. A witness who was about 150 feet from the scene when the first shot was fired, testified that there was no shooting done by any of the police officers before Olson and Walsh fell. Several witnesses on behalf of the State testified to hearing the ringing of the gong on the Paige car during the pursuit, while other witnesses on behalf of the defense, who saw the two cars, testified that they did not hear a gong rung.

Scalisi testified that about Forty-seventh or Forty-eighth street Genna turned around and saw the Paige car that was coming and said, "I don't know what car it is; maybe

some people want to kill me;" that when they got to Fifty-ninth street Genna said, "That is the people who want to kill me;" that before the car had come to a stop he and Genna had taken a revolver at about Fifty-fifth or Fifty-sixth street; that they took them because Genna said, "If these people are coming to kill me they will kill you too;" that there was something the matter with the car so they could not go any faster; that as the Paige car came up he saw people with two shot-guns in the back of the Paige car, pointing at the Cadillac; that the Paige car came up alongside on the left; that when the Paige car was about two feet ahead of them some man who was in the rear of the car fired a shot and witness threw himself on the floor of the car; that after the shot was fired the Cadillac swerved so that the back was to the west; that as soon as the Cadillac stopped the three of them got out and Genna picked up two shot-guns, one of which he gave to witness and the other he kept himself; that the three of them crouched behind the car; that he raised his head and saw three people coming toward him, one with a shot-gun and two with revolvers pointed at him; that when he raised his head there were two revolvers shots fired at him; that after that Genna got up and fired three shots; that witness then raised his head and saw a man wearing a straw hat coming toward him, at whom he fired; that after the shot the man put his hand to his chest and walked toward his car; that Anselmi then said, "Come on; let us go and get away from here or they will kill us;" that he and Anselmi then started and ran across the prairie and were arrested as they were attempting to board a street car some blocks away; that none of the three men who had advanced from the Paige car toward the Cadillac said anything about being police officers. The evidence shows that Angelo Genna, a brother of Mike, was shot while riding in an automobile a short time before, and that another brother was killed in like manner shortly after June 13.

Anselmi's testimony was substantially to the same effect as that of Scalisi. They both testified that when they saw the men advancing from the Paige car toward the Cadillac with guns and revolvers in their hands they were afraid that these men meant to harm them. After their arrest they were taken to the basement of 5941 Artesian avenue, where Genna lay dying, and they denied knowing Genna and having participated in the shooting.

After the battle the Cadillac car was discovered to have a hole on the left side, about 3 inches from the rear, a few inches from the top of the middle part of the body and approximately 44 inches from the ground, which it is claimed by plaintiffs in error was made by the entrance of the metal charge of a gun fired from the Paige just as it was passing the Cadillac. At the rear of the Cadillac, about 3 inches from the left side of the car and approximately 43½ inches from the ground, was the exit opening. The excelsior stuffing between the metal and the cushions was bored through, showing the path of the charge. The entrance opening measured about 1¾ inches by 1½ inches and was somewhat funnel-shaped. The exit hole was about 1¾ inches by 2¾ inches. At this opening the metal was torn into strips and bent out. If this perforation was made during the battle it must have been made before the cars stopped, as that was the only time that the left side of the Cadillac was exposed to fire from the officers.

A witness connected with the Cadillac Motor Company in Chicago testified that he sold the car in question on March 4, 1925, and that it was billed to Frank Marino, 140th or 145th street, South Western avenue. A detective sergeant testified that he had tried to find Frank Marino and had gone to a barber shop at 72 East Twenty-second street to look for him and Marino was not there; that he examined the vehicle tax records at the city clerk's office and found that the license vehicle tag on the Cadillac car had been issued to Frank Marino, 1451 South Western

avenue; that he went to that number and found it to be a railroad yard and there was no Frank Marino living there; that he inquired for him at 14500 Western avenue, which was a vacant lot. The court denied a motion of plaintiffs in error to strike out the evidence of this detective sergeant, and this is assigned as error. There is no evidence in the case tending to show that either plaintiff in error had any connection with this car other than riding in it upon this one occasion. The evidence was not competent as against them and should have been stricken out.

A deputy clerk of the United States district court for the northern district of Illinois identified certain records of that court which were introduced in evidence over the objections of counsel for plaintiffs in error. These records showed that Mike Genna, who was shown by other evidence to be the Mike Genna who drove the Cadillac car, was the defendant in an indictment charging transportation of a stolen automobile in interstate commerce; that he gave bond and subsequently forfeited it, and that bench warrants thereupon issued for his arrest, and that such bench warrants were returned to the files unexecuted. Certain Wisconsin court records were introduced in evidence, over objection of plaintiffs in error, which showed a charge of burglary against Mike Janna, who was identified as the Mike Genna of this case, a bond forfeiture, judgment on the forfeiture and satisfaction and discharge of the judgment. The purpose in offering these records was to show that Genna on the 13th of June, 1925, was a fugitive from justice. The evidence was that Genna was a prominent member of different Italian clubs and well known to and an associate of several police officers. There is no evidence in the record that either plaintiff in error ever knew anything about these charges against Genna, and the records did not in any way prove or tend to prove their state of mind or motive at the time of the shooting. This evi-

dence was incompetent as to them and its reception was prejudicial error.

During the cross-examination of Sweeney the State's attorney produced two police squad-guns, the production of which had previously been requested by counsel for plaintiffs in error, and as he handed the guns to counsel for plaintiffs in error said, "It is too bad the police don't use these a little more on your clients." An objection to this statement was sustained and the jury cautioned to disregard the remarks.

An attempt was made to impeach Scalisi by a statement which he made to State's attorney Crowe on June 13 at the new city police station. Answering an objection thereto, the State's attorney, in the presence of the jury, said: "He is telling one story on the stand here, and at the time I talked to him right after the transaction he told an entirely different story; he was making a defense then; his counsel did not think it would get across in this case." This statement was objected to and it was stricken from the record by the court and the jury directed not to regard or consider it further, but this statement of a fact purporting to be within the personal knowledge of the State's attorney, who was not sworn as a witness, strongly tended to lessen the credibility of plaintiffs in error, and striking it from the record could not eradicate it from the minds of the jurors.

During the argument to the jury by counsel for Anselmi a colloquy took place between him and the State's attorney, in the course of which the State's attorney said, in the presence of the jury: "The people who need protection in Chicago now is not the Gennas and the gunmen but the police against the gunmen; why, only last night a policeman had his head blown off by a bomb." A motion was made on behalf of both plaintiffs in error for the withdrawal of a juror and a continuance of the cause because of this highly prejudicial and inflammatory remark of the

State's attorney, which motion was denied. Plaintiffs in error were on trial for the killing of a policeman. This remark could not fail to have a prejudicial effect against them, and the fact that the court sustained an objection to the remark and ordered it stricken from the record and instructed the jury to disregard it could not cure the prejudicial knowledge obtained by the jury that another policeman had been killed the night before.

Plaintiffs in error sought to have the court give to the jury a series of instructions defining the rights of policemen to make arrests without warrants and defining their right to use fire-arms in making arrests, and also requesting the court to give instructions defining manslaughter and to give the jury a form of verdict for manslaughter, all of which the court refused, and such refusal is assigned as error. It is contended by defendant in error that inasmuch as plaintiffs in error both testified that they did not know the occupants of the Paige car were police officers until after the battle was over, and as the police officers were not attempting to make an arrest, no question as to what constitutes an illegal arrest can arise in this case. While plaintiffs in error did so testify the jury evidently did not believe that part of their testimony. If they did, they would have, unless influenced by passion or prejudice, found them not guilty. Plaintiffs in error were entitled to have the jury instructed not only as to the law applicable to the state of facts testified to by them, but applicable to any state of facts which the jury might legitimately find from the evidence to have been proven. A defendant is entitled to the benefit of any defense shown by the entire evidence, even if the facts on which such defense is based are inconsistent with the defendant's own testimony. They were on trial for murder and could only be convicted of that crime or a lesser offense. Even if the jury believed plaintiffs in error to be guilty of perjury, the jury could not find them guilty of murder if a consideration of the

324—10

entire evidence did not, beyond a reasonable doubt, show them to be guilty of murder.

That the police squad were attempting to arrest the persons in the Cadillac car at the time in question is shown conclusively by the evidence of Conway, the leader of the squad. They were attempting to make what the assistant State's attorney, in his oral argument before this court, called an "arrest for questioning." Under the common law, in England sheriffs, constables and watchmen were authorized to arrest felons, and persons reasonably suspected of being felons, without a warrant, and as conservators of the peace they also had authority to make arrests without warrants in cases of misdemeanors which involved breaches of the peace committed in the presence of the officers making the arrests, and could not be stopped or redressed except by immediate arrest. (2 R. C. L. 446; *North* v. *People,* 139 Ill. 81; *Kindred* v. *Stitt,* 51 id 401.) Policemen were unknown to the common law, but they are generally considered as having the same powers as watchmen and constables. (*Shanley* v. *Wells,* 71 Ill. 78.) At common law watchmen and beadles had authority to arrest and detain in prison for examination any suspicious nightwalker. (*Lawrence* v. *Hedger,* 3 Taunt. 14; 2 Hawk's P. C. chap. 13, sec. 6, chap. 12, sec. 20; *Miles* v. *Weston,* 60 Ill. 361.) By paragraph 681 of the Criminal Code in this State an arrest may be made by an officer or by a private person without warrant for a criminal offense committed or attempted in his presence, and by an officer when a criminal offense has in fact been committed and he has reasonable ground for believing that the person to be arrested has committed it. When such arrest is made without a warrant, either by an officer or a private person, the person arrested shall without unnecessary delay be taken before the nearest magistrate in the county, who shall hear the case for examination, and the prisoner shall be examined and dealt with as in cases of arrest upon warrant. (Crim. Code, par. 684.)

As in this State a criminal offense consists in a violation of a public law, in the commission of which there shall be a union or joint operation of act and intention or criminal negligence and may be either a misdemeanor or a felony, the term "criminal offense" in paragraph 681 must be held to include misdemeanors as well as felonies, and thereby the right of officers to make arrests is much greater than at common law. It is the rule in this State that an officer has the right to arrest without a warrant where he has reasonable ground for believing that the person to be arrested is implicated in a crime. (*People* v. *Swift,* 319 Ill. 359.) ·Whether or not in a given case there are reasonable grounds to warrant an arrest is a mixed question of law and fact. To justify the officer in making an arrest without a warrant his ground for belief that the person to be arrested is guilty of a crime must be such as would influence the conduct of a prudent and cautious man under the circumstances. (*Kindred* v. *Stitt, supra.*) While an officer, generally, may use a deadly weapon, even to the extent of taking life, if necessary to effect the arrest of a felon, for the reason that the safety of the public is endangered while such felon is at large, the rule is that except in self-defense an officer may not use a deadly weapon or take life to effect an arrest for a misdemeanor, whether his purpose is to kill or merely stop the other's flight. This is true even though the offender cannot be taken otherwise. *People* v. *Klein,* 305 Ill. 141; *North* v. *People, supra; State* v. *Smith,* 127 Iowa, 534; *Edgin* v. *Talley,* 276 S. W. 591; *Harding* v. *State,* 26 Ariz. 334; *Coldeen* v. *Reid,* 107 Wash. 508; *Crosswhite* v. *Barnes,* 139 Va. 471; *Terrell* v. *Commonwealth,* 194 Ky. 608; *State* v. *Boggs,* 87 W. Va. 738; *Pamplin* v. *State,* 205 Pac. 521.

False imprisonment is an unlawful violation of the personal liberty of another, and consists of confinement or detention without sufficient legal authority. (Crim. Code, par. 227.) In order to constitute false imprisonment it is

not necessary to show that the person guilty thereof used physical violence or laid hands on the person falsely imprisoned or confined him in a jail or prison, but it will be sufficient if at any place or time he in any manner restrained such person of his liberty or detained him in any manner from going where he wished or prevented him from doing what he desired. (*Hawk* v. *Ridgway,* 33 Ill. 473.) In *Board of Trustees* v. *Schroeder,* 53 Ill. 353, it is said: "When officers assume the power to imprison without authority of law, or without any of the forms or processes usual and necessary to be employed, they become liable for false imprisonment. The liberty of the citizen can not be so far trifled with that any constable in the land may of his own volition commit and hold him in custody until it suits his convenience or pleasure to release him."

We are reminded by the Declaration of Independence that all men have been endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness; that to secure these ends governments were instituted among men. Our youth are familiarized in school with these fervent words of Patrick Henry: "Give me liberty or give me death." To most citizens the right of liberty is as sacred as life itself. To such an extent is this sentiment recognized that the constitutions of the United States and Illinois have attempted to safeguard the liberty of the citizen. The right to resist unlawful arrest for a misdemeanor is universally recognized. Whether the person whose right to liberty and freedom from illegal arrest is guilty of any offense when he kills the aggressor depends upon the circumstances of the case. He has no right to kill an officer who attempts to commit a trespass upon his person and nothing more, and where the arrest is made by a known officer and nothing is to be reasonably apprehended beyond a mere temporary detention in jail, resistance cannot be lawfully carried to the extent of taking life. (*State* v. *Meyers,* 110 Pac. 407.) So great,

.however, is man's natural indignation at an unlawful infringement upon his liberty that it is the general rule in England and this country that if a public officer be resisted and killed by a person whom he is attempting to illegally arrest without color or authority of law the killing will be manslaughter, only, unless the evidence shows previous or express malice. *Rafferty* v. *People,* 69 Ill. 111; *Same* v. *Same,* 72 id. 37; *People* v. *Brown,* 288 id. 489; *People* v. *Bissett,* 246 id. 516; *Briggs* v. *Commonwealth,* 82 Va. 554; *Commonwealth* v. *Carey,* 66 Mass. 246; *State* v. *Symes,* 55 Pac. 626; *Stockley's case,* 1 East's P. C. 310; *Wright* v. *Commonwealth,* 85 Ky. 123; *Rex* v. *Bright,* 4 Car. & P. 387; *Porter* v. *State,* 124 Ga. 297; *Williford* v. *State,* 121 id. 176; *Rex* v. *Chapman,* 12 C. C. 4; *Regina* v. *Lockey,* 4 Fost. & F. 155; *Jenkins* v. *State,* 59 S. E. 435; *Hurd* v. *State,* 119 Tenn. 583; *Miller* v. *State,* 20 S. W. 1103; *People* v. *Burt,* 51 Mich. 199; *Simmerman* v. *State,* 17 N. W. 115.

Express malice is that deliberate intention unlawfully to take away the life of a fellow-creature which is manifested by external circumstances capable of proof. Malice shall be implied when no considerable provocation appears or when all the circumstances of the killing show an abandoned and malignant heart. (Crim. Code, par. 337.) The distinction between express malice and implied malice is drawn in *Davison* v. *People,* 90 Ill. 221, as follows: "The word 'malice' is defined to be a formed design of doing mischief to another, technically called *malitia præcognitata,* or malice prepense. It is either expressed, as where one with a sedate and deliberate mind and formed design kills another, which formed design is evidenced by certain circumstances discovering such intention, as in lying in wait, antecedent menaces, former grudges and concerted schemes to do him some bodily harm; or implied, as where one willfully poisons another. In such a deliberate act the law presumes malice though no particular enmity can be proved."

One difference between express malice and implied malice is the manner by which they may be shown to exist. Implied malice may be inferred from the act or manner of committing the homicide, but express malice can only be proven by evidence of facts outside of the homicide itself which show the existence of the inward intention. *Martinez* v. *State,* 30 Tex. App. 129; *Commonwealth* v. *Green,* 1 Ash. 289; *Darry* v. *People,* 10 N. Y. 120; *State* v. *Milam,* 88 S. C. 127; *Henderson* v. *State,* 120 Ga. 504.

When the police squad sought to infringe upon the liberty of plaintiffs in error and arrest and detain them for questioning they had no reasonable ground to suspect that either plaintiff in error had been guilty of any crime, and plaintiffs in error were not nightwalkers or vagrants, and hence the attempt to arrest and detain them was unlawful. The court, in the instructions to the jury, did not differentiate as to the effect of the two kinds of malice, but by its instructions authorized a verdict of guilty of murder if Olson was unlawfully killed with malice, either express or implied, even if at the time of his death he was attempting to unlawfully restrain plaintiffs in error of their liberty. The peculiar facts in this case required that the jury be instructed as to the right of police officers to make arrests, their right to use deadly weapons in attempting to arrest for misdemeanors, the right of a citizen to resist an unlawful arrest, the distinction between murder and manslaughter, and as to the form of verdict for manslaughter. That the jury had grave doubts as to whether the offense proven was murder or manslaughter is manifested by the fact that after deliberating for a period of about six hours the jury sent to the court, by the bailiff, the written question, "What is the law on · manslaughter?" Thereupon counsel for plaintiffs in error again requested the court to give instructions on the subject of manslaughter and a form of verdict finding defendants guilty of manslaughter, but the court refused the request and sent a written answer

to the jury, "The court has given to the jury all that it is going to give."

It is argued by defendant in error that this court should take judicial notice that in the city of Chicago scarcely a week passes by but some murder is committed in the public streets and that a state of anarchy almost exists there by reason of lawless bandits with high-powered cars and sawed-off shot-guns. While such a condition, if it exists, is greatly to be deplored, courts cannot suspend or modify laws or make new laws as to the respective rights of policemen and citizens to meet these conditions but courts must function in accordance with law. In *Starr* v. *United States,* 153 U. S. 614, the Supreme Court very aptly said: "Whatever special necessity for enforcing the law in all its rigor there may be in a particular quarter of the country, the rules by which and the manner in which the administration of justice should be conducted are the same everywhere, and argumentative matters of this sort should not be thrown into the scales by the judicial officer who holds them."

The judgment in this case of fourteen years in the penitentiary was a travesty of justice from whatever angle viewed. If the plaintiffs in error were not guilty or were guilty of manslaughter only, sentencing them for murder was an injustice. If guilty of murder, a sentence of fourteen years,—the least penalty,—under the circumstances of this case is but a mockery of justice.

For the reasons suggested in this opinion the judgment of the criminal court is reversed and the cause remanded.

*Reversed and remanded.*

Mr. JUSTICE DEYOUNG, dissenting.