(No. 26748.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ATHON PAPAS, Plaintiff in Error.

*Opinion filed November 17, 1942.*

Wm. Scott Stewart, for plaintiff in error.

George F. Barrett, Attorney General, and Thomas J. Courtney, State's Attorney, (Edward E. Wilson, John T. Gallagher, and Melvin S. Rembe, of counsel,) for the People.

Mr. Justice Smith delivered the opinion of the court:

This is a writ of error to review a judgment of the criminal court of Cook county. Plaintiff in error, Athon Papas, was convicted by the verdict of a jury of the crime of murder. After the denial of a motion for new trial, he was sentenced to imprisonment for a term of ninety-nine years.

The fatal shooting occurred about 12:30 on the morning of May 29, 1939. Muriel Campbell, the deceased, was one of a party of five high-school students who had been out together that evening in Muriel's car. As they drove by a fruit store at Park and North avenue, Muriel said she was hungry and wanted some fruit. They drove around the block and parked in front of the stand, and Muriel, Harry Feigenbaum and Helen Freilich got out of the car and walked over to the stand. Helen picked up a watermelon and tossed it to Muriel, who caught it and threw it back. Helen dropped it and it cracked; they then picked it up and started into the store with it. About that time Christ Neforas, a clerk in the store, came out and accused the girls of stealing the melon and said he would call the police. Although they offered to pay the damages, Neforas

told Helen Freilich to come into the store. Muriel returned to the car and told Feigenbaum that Helen was being detained by Neforas. Feigenbaum then got out of the car and went into the store where Helen was being detained by the clerk.

The defendant, Papas, who was engaged as a watchman at the fruit store, was in the back of the store at the time eating his midnight lunch. Neforas called to him to come out, and told him that Harry Feigenbaum and Helen Freilich had stolen the melon. From this point, the accounts as to what happened differ. Helen Freilich and Harry Feigenbaum testified that Harry tried to reason with Neforas and Papas, and offered to pay for the melon. They denied any intention of stealing it. Papas then drew a gun, and seized Harry by the arm, tearing his sweater; Harry resisted and Papas fired a shot into the floor. By that time Helen had left the store. As Harry wrenched himself away from Papas, he fell into a bin of potatoes. As he arose he commenced throwing potatoes at Papas for the purpose of spoiling his aim if Papas tried to shoot again. Papas was thus driven to the rear of the store, and Harry went out the front door and joined Muriel, who had come back in the meantime and was outside the store. After leaving the store, they walked about twenty feet, looking for the car. Bernard Goldstein, who had remained in the car had moved it upon hearing the shot. Not seeing the car, Harry, Muriel and Helen started to run across a vacant lot and up an alley. As they ran down the alley two shots were fired by Papas, one of which struck Muriel in the back of the head and killed her instantly. The point where she fell was some 290 feet from the store.

Defendant's version of the events leading up to the fatal shooting is found in the testimony of Neforas and Papas. They say that as soon as Papas was informed of the charges Harry Feigenbaum and Helen attempted to leave the store, and Papas grabbed Harry to detain him.

A scuffle followed, in which Feigenbaum's sweater was torn off. Neforas' testimony is uncertain and contradictory. He says he had started to the telephone to call the police. Papas insists that Harry hit him in the face and kicked him; that he then fired into the floor to scare Harry; that Harry jumped back and fell into the potatoes. Papas' glasses were broken by Harry's blows and fell to the floor. Papas says Harry chased him into the back room and threw potatoes at him, and that meanwhile the girl disappeared. When he came back out Harry was leaving, and as he got to the front door he saw Harry going through the vacant lot. Papas claimed that he fired two shots into the air to frighten Harry; that he never saw either Muriel or Helen when the shots were fired. When he fired the second shot he heard a girl scream and went back into the store, where he awaited the arrival of the police.

The bullet which struck deceased was fired from Papas' gun. There is no question raised that Papas did not fire the fatal shot.

The case came on for trial on July 26, 1939. On July 1, 1939, the amendment to the Jury Commissioners act, making women eligible for jury duty, became effective. No women were included in the panel. The defendant challenged the array for that reason. The prosecutor informed the court that the jury commissioners considered the amendment unconstitutional and refused to follow it for that reason. The court then overruled the challenge without any further hearing. Since that time the constitutionality of the amendment has been upheld by this court in *People ex rel. Benny v. Traeger*, 372 Ill. 11.

It is argued that the trial court erred in overruling the challenge to the array. The record shows that defendant's challenge was in writing. It alleged that a diligent examination of the record showed none of the jurors on the panel to be women; that the jury commissioners had wilfully failed to comply with the act, as amended. Standing

alone, this challenge would not constitute grounds for allowing the challenge, since it was not sworn to, and it is presumed that the commissioners acted legally. (*People v. Konkowski,* 378 Ill. 616.) However, counsel for defendant offered to prove the allegations in the motion, challenging the array, but the prosecuting attorney stated, "There is no need of proving something that we all know. It is a question of law which has not been settled by our Supreme Court."

The only reasonable interpretation which can be placed upon the action of the trial court in this regard is that it intended to ignore the act of the legislature until such time as this court should decide whether or not that act was constitutional. This, the court· had no right to do. By such action the court assumed the law to be unconstitutional until its validity had been determined by this court. The presumption, if any, is in favor of the constitutionality of an act, and not against it. If the trial court was unwilling to pass upon the question of the constitutionality of the act, then it was the court's duty to follow the mandate of the law until its invalidity had been determined.

In the view we take of this case, it will be unnecessary to go further into this question. There are other errors in the record which require a reversal of the judgment. At the conclusion of the trial, the defendant submitted an instruction defining manslaughter, and also an instruction as to the form of verdict to be used if the jury should find the defendant guilty of manslaughter. Both instructions were refused. The court did not submit the question of manslaughter to the jury in any of the instructions which were given. In support of this action of the trial court, the People argue that there was no evidence which tended to show the crime to be manslaughter, instead of murder. It is the settled rule in homicide cases that if there is evidence in the record which, if believed by the jury, would reduce the crime to manslaughter, an instruction defining man-

slaughter should be given. (*People* v. *DeRosa*, 378 Ill. 557; *People* v. *Pursley*, 302 id. 62; *People* v. *Bacon*, 293 id. 210.) The defendant was entitled to the benefit of any defense shown by the evidence, even if inconsistent with his own testimony. *People* v. *Scalisi*, 324 Ill. 131.

The question, then, is whether or not there is any evidence which, if believed by the jury, would reduce the offense from murder to manslaughter. If there is such evidence, then it was error on the part of the court to refuse the offered instructions relating to manslaughter.

We have repeatedly held that, in order to prove a charge of murder, there must be a showing that the killing was done with malice aforethought, either express or implied. (*People* v. *Bartley*, 263 Ill. 69; *People* v. *Bissett*, 246 id. 516.) This is the requirement of the Criminal Code. The element that distinguishes murder from manslaughter is malice; the common factor which is found in both crimes is the unlawful killing of a human being. (*People* v. *Lewis*, 375 Ill. 330.) In order to establish express malice, there must be proof of deliberate intention. Implied malice is presumed where no considerable provocation appears or when all the circumstances of the killing show an abandoned and malignant heart. Ill. Rev. Stat. 1941, chap. 38, par. 358.

In this case plaintiff in error contends that the killing was without intent or malice on his part. He testified to acts of provocation on the part of Harry Feigenbaum, when Feigenbaum drove him to the rear of the store by the force of his assault. His duties as watchman of the property were such that he was allowed to carry a gun, for which the police had issued a permit. His testimony is that he did not, at the time the fatal shot was fired, see deceased, who was over two hundred feet away. Had the jury been properly instructed, this testimony might have been sufficient, in the minds of the jury, to reduce the homicide to manslaughter. If his testimony was believed by the jury,

it might have raised a reasonable doubt on the question of malice. In that event, the jury might have found him guilty of manslaughter instead of murder.

In a case tried by a jury it is the province of the jury, not the judge, to decide the guilt or innocence of the accused. It is equally the province of the jury to decide whether or not the accused is guilty of murder, or of the lesser crime of manslaughter, if there is any evidence which tends to prove the lesser rather than the greater crime. We have repeatedly rejected instructions which, as a matter of law, took the decision of this question from the jury. *Bleich* v. *People,* 227 Ill. 80; *Steiner* v. *People,* 187 id. 244; *Lynn* v. *People,* 170 id. 527; *Panton v. People,* 114. id. 505.

The defendant was entitled to have submitted to the jury any defense which his testimony, or any other evidence, tended to prove. (*People* v. *Scalisi, supra.*) If the jury chose to believe him and not the witnesses for the prosecution, it is entirely possible that they might have found the defendant guilty of manslaughter and not of murder. However, under the instructions given, the jury had no alternative than to find him guilty of murder, or not guilty. The province of the jury to determine the weight of the testimony of the various witnesses was definitely invaded by the refusal of the court to give the instruction defining the crime of manslaughter and an instruction as to the form of the verdict for that offense. The People argue that the testimony of plaintiff in error is confusing as to what defenses he is urging. This is immaterial. In *People* v. *Scalisi, supra,* we said that the accused is entitled to the benefit of any defense based on the evidence, even though such defense is inconsistent with his own testimony. We there said, (p. 145,) "Plaintiffs in error were entitled to have the jury instructed not only as to the law applicable to the state of facts testified to by them, but applicable to any state of facts which the jury

might legitimately find from the evidence, to have been proven." Under that rule, it was error for the trial court to refuse the instructions offered defining the crime of manslaughter, and as to the form of the verdict in case the jury found the defendant guilty of the lesser offense.

For the errors above indicated, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*