[No. 38612.   Department Two.   August 24, 1967.]

PAUL ARTHUR TUFTE, *Respondent*, v. THE CITY OF TACOMA, *Appellant.**

*Reported in 431 P.2d 183.

*Miracle, Treadwell & Pruzan,* for appellant.

*Neil Hoff,* for respondent.

LANGENBACH, J.†—Respondent sued the city of Tacoma and its chief of police for false arrest and false imprisonment. The chief of police was dismissed. From a verdict for respondent, the city of Tacoma has appealed.

Mr. Paul Arthur Tufte, respondent, was suffering from diabetes and took medication to control that disability. This required that he eat at scheduled intervals to achieve a balance between medication and food consumption. On May 16, 1964, a Saturday, respondent arose early and, after having taken his prescribed medicine and having eaten breakfast, went fishing from his boat in Puget Sound, near Tacoma. It was necessary that he eat again promptly at noon. Respondent fished until 11:15 a.m. when he returned the boat to its moorage and secured it. He then relaxed in a deck chair and dozed. Upon awakening, he finished securing the boat. That is the last thing he remembered until he awoke much later in the Tacoma city jail's drunk tank.

At 2:24 p.m. the police, in response to a call, went to the corner of Jefferson and Pacific streets in Tacoma where they found respondent slumped over the wheel of a small car of foreign manufacture. The motor was running, and the car was faced in the wrong direction on a one-way street. Upon turning off the motor, the police officers checked respondent's pulse, which was strong, shook him awake and assisted him out of the car. Both officers felt that they detected the odor of alcohol about respondent and that his eyes were bloodshot. They found his walk unsteady and his speech slurred.

Respondent was placed in the back seat of the patrol car where he answered questions about his vital statistics but, unaccountably, did not inform the officers of his diabetic condition. While he produced, after considerable effort, the

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

wallet which contained his driver's license, the officers declared that they did not see a card therein which stated: "I am a Diabetic. I am not intoxicated." The officers concluded he was drunk, impounded his automobile and took him to the city jail where he was charged with being drunk in an auto.

At the jail respondent was booked, searched and the contents of his pockets removed. This process at least included removing the money from his wallet. He was placed in the drunk tank to sober up. The time was about 3 p.m., and the shifts of the arresting officers and jail booking officer were changing. Respondent was left lying on the drunk tank floor in the appearance of sleep.

When respondent had not returned home for lunch by one o'clock, his wife became alarmed. She checked at the boat moorage and about 4 p.m. contacted the police. She testified that she told them her husband was a diabetic and that she feared he was in insulin shock. Giving a description of the car (a Renault sedan) and its license number, she urged that they find the car and pull it over to the side of the road. The officer replied that the police could not do that.

In addition to numerous additional calls to the department, respondent's wife also called the sheriff's office, the state patrol, radio station KTNT and gave them similar particulars. She also called respondent's personal physician, Dr. Betteridge. Between 6 and 7 p.m., Dr. Betteridge telephoned the Tacoma police department. He asked if they had a party named Mr. Tufte. He told them that Tufte was a diabetic who had failed to return home and that the police should be on the lookout for him as he could well be slumped over the wheel of his car on the roadside in an insulin reaction. The doctor was told that they would be on the lookout for Mr. Tufte.

Respondent remained unconscious in the jail's drunk tank until about 3 a.m. Sunday morning when he came to and discovered where he was. He called the officers, and they allowed him to bail himself out of jail for $35. Upon

being released, he was given his possessions. He testified that:

[An officer] gave me a bag. It had my name on the bag, and he dumped the stuff out on the desk. Everything fell out, my sugar, my saccharine tablets, my keys, my billfold, my driver's license, everything.

. . . .

I saw the driver's license. I said, "That's funny, I never had my driver's license laying loose like that." I started to put it back in my billfold, and right with it was my diabetic card and I said, "Look, there is my diabetic card. Why did I have to bail myself out?" He said, "Well, you were put in here for being drunk. There is nothing I can do about it."

Respondent ate some sugar lumps and called his wife. She drove toward the jail and found him on the street in a dazed and confused condition, after he had been released by the jailer. Together they returned to the jail where Mrs. Tufte complained of the treatment given them by the police. They were told to come back Monday morning if they had any further complaint. On Monday they went to the chief of police and informed him, and a captain, of the treatment Mr. Tufte had received. They also went to police court where respondent had been ordered to report. After hearing respondent's story, the police judge reinstated the bail which had been ordered forfeited and continued the case. The chief of police had promised an investigation, and when this was later completed, the drunk charge was dismissed, but a charge of negligent driving was substituted. In time this, too, was dismissed, but the bail was not returned to respondent.

This action was then commenced which resulted in a verdict for respondent, from which the appeal was perfected.

We may note in limine that there is no contention made that the police officers, jailers, and others who acted in the name of the city of Tacoma were not acting entirely within the scope of their employment. See *Kelso v. Tacoma*, 63 Wn.2d 913, 390 P.2d 2 (1964).

▆▆▆▆ The appellant argued that the arrest of respondent was lawful. We agree that the original arrest was justifiably made under the plausible belief that respondent was intoxicated. But the fact that the arrest might have been lawful did not determine that the subsequent imprisonment was also entirely lawful. This is the flaw in appellant's assignment of error to the court's failure to instruct the jury that:

[T]he arrest was lawful. Accordingly, you are instructed that Plaintiff cannot recover damages from Defendant for his arrest or for being placed in jail pursuant to that arrest.

This is a non sequitur inasmuch as it fails to recognize that a lawful imprisonment following proper arrest may under some circumstances become unlawful. See *e.g. Housman v. Byrne,* 9 Wn.2d 560, 115 P.2d 673 (1941). The proposed instruction suggested that consideration of the facts surrounding the imprisonment was foreclosed if there was initially a lawful arrest. That is not a correct instruction, and it was not error to refuse an instruction which incorrectly stated the law. *State v. Twitchell,* 61 Wn.2d 403, 378 P.2d 444 (1963).

The trial court instructed the jury that:

*Plaintiff's claim against Defendant is based on two charges:* wrongful arrest and false imprisonment.

If you find that the arrest was wrongful, the imprisonment that followed it was improper as well.

On the other hand, if you find that the arrest was for probable cause, then the Plaintiff cannot recover for either the arrest or for being placed in jail pursuant to such arrest, *unless you find he was held in jail after authorities knew or should have known that he was held falsely.* (Italics ours.) Instruction No. 10.

Appellant took exception and assigned error to the emphasized portion of this instruction. That portion is not erroneous. Our law makes actionable the intentional confinement of another's person, unjustified under the circumstances. Intentionally to hold another in confinement for being drunk when one knows or should know that he is not drunk, is to confine him unjustifiably.

While appellant attacked the form of the instruction, it did not suggest, nor could it reasonably, that there was insufficient evidence to uphold a jury verdict of liability under that instruction.

The chief of police testified that all officers are trained to detect the different signs of a diabetic; that they are taught to be suspicious and to check further when a man is brought in as intoxicated. Moreover, the police are taught to be alert for the unusual odor sometimes associated with a diabetic and to take notice of medicines, and such things as sugar lumps, found on an arrested person. When Mr. Tufte was booked, he carried lumps of sugar and a bottle of saccharine tablets. His wallet, as well, contained a card warning of his diabetic condition.

The chief of police testified that they followed a general policy that persons jailed for intoxication will be held 4 hours. The jailer testified that if someone incarcerated shows signs of being ill, "even so much as a bad cold," it is their responsibility to see that he is sent to a proper facility. Mr. Tufte was left lying on the drunk tank floor from Saturday afternoon until he came to early Sunday morning.

Mr. Tufte's wife called the police on numerous occasions, giving the description and license number of the car which the police had impounded and the name of her husband whom they had jailed. Dr. Betteridge called the police and told them that Mr. Tufte was a missing diabetic, possibly to be found slumped over the wheel of his car in an insulin reaction. Even as these calls were being made, Mr. Tufte lay unconscious on the floor of the jail, having been found by the police under just those circumstances.

There was evidence that appellant intended to confine, and did confine, respondent in its jail. While the evidence established that the confinement was initially privileged because of appellant's reasonable initial belief that respondent was drunk, the evidence also established that thereafter appellant received such knowledge of the true nature of respondent's condition as negatived the reasonable belief that he was intoxicated. There was no justification for hold-

ing him beyond that point. In fact, from that point, on, appellant was under a duty to release respondent from confinement, more particularly because of the extreme danger to respondent's health attendant upon lack of immediate care.

We affirm so much of the verdict as imposes liability upon appellant for the false imprisonment of respondent Tufte. However, the court should have instructed the jury that as a matter of law there was probable cause for the initial arrest of respondent. A new trial is granted limited to the question of damages sustained by plaintiff.

Our disposition of the case renders unnecessary the consideration of appellant's argument that the damages granted were excessive. However, appellant also criticized the damage instruction given· in this case, and because a new trial must be had on the issue of damages, we consider it not inappropriate to address a few words to that subject.

■ The court instructed, in part:

If your verdict is in favor of the Plaintiff, then in assessing the amount of recovery, you should allow such sum as in your opinion will fairly compensate the Plaintiff for the damages, if any sustained, arising out of the . . . jailing. *You should take into consideration the nature, character and extent of Plaintiff's injury,* mental suffering, anguish of mind, humiliation or loss of reputation, if any, that you find he has endured or will endure in the future. (Italics ours.) Instruction No. 12.

Appellant's criticism of this instruction is based on the ground that there was no evidence that respondent suffered any physical injury. Dr. Barronian's testimony that he did not "find" any physical injury to respondent and Dr. Betteridge's testimony that there was no material brain damage that he could "detect" must be read in conjunction with the testimony that "damage can occur without tests being done to really measure accurately that it has occurred. The only way is to perform a post-mortem brain examination, . . . ." The doctors did testify that blood sugar is the only nourishment the brain can use; lack of sugar causes unconsciousness; the probable medical cer-

tainty is that lack of sugar is destructive of brain cells, which do not regenerate; damage to the brain cells is the reason for the shock. *As long as unconsciousness due to lack of sugar persists, damage is being done; damage is in proportion to the length of time and degree of shock;* each insulin reaction makes control of the patient more difficult in the future.

Thus, while the doctors said they could not "detect" the damage (as an autopsy could not be performed on the living respondent), it is a fact, to quote appellant's brief, that "The doctors testified that when a person goes into insulin shock or reaction, there is damage to brain cells." There was, further uncontradicted testimony that this damage is in proportion to the length of time one is in shock. Thus, while the jury was not allowed to speculate as to the amount of brain damage, they were free to find that damage was occurring during reaction, and this damage was in proportion to the length of time respondent remained in that reaction. Therefore, the hours of isolated imprisonment, during which respondent was denied treatment, increased the severity of the damage to respondent's brain cells.

To recapitulate, the verdict on liability is affirmed; a new trial is granted limited to the question of damages sustained by plaintiff. It is so ordered.

FINLEY, C. J., DONWORTH, HAMILTON, and NEILL, JJ., concur.