

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

KATHLEEN MANCINI, a single
woman,

        Appellant,

        v.

CITY OF TACOMA, a municipal,
entity and political subdivision of the
State of Washington; TACOMA
POLICE DEPARTMENT; and RON
RAMSDELL, individually and in his
official capacity as chief of Tacoma
Police,

        Respondents.

DIVISION ONE

No. 71044-3-I

UNPUBLISHED OPINION

FILED: June 8, 2015

DWYER, J. —

*Courts, not the Legislature, legislated the public duty doctrine.*

Justice Tom Chambers[1]

During his tenure on our state's highest court, Justice Chambers devoted

significant attention to the public duty doctrine. On more than one occasion, he

wrote separately, urging that the doctrine be either disavowed or applied in a

---

[1] Babcock v. Mason County Fire Dist. No. 6, 144 Wn.2d 774, 796, 30 P.3d 1261 (2001)
(Chambers, J., concurring).

manner faithful to its origin. For a time, his view did not prevail. However, in 2012, he authored yet another separate opinion that, despite its modest identification as a concurrence, was signed by a majority of the members of our Supreme Court and, resultantly, controls the decisions made by members of our state's judiciary. See Munich v. Skagit Emergency Commc'n Ctr., 175 Wn.2d 871, 288 P.3d 328 (2012) (Chambers, J., concurring).

Justice Chambers' opinion in Munich is instructive in resolving this appeal, given that the plaintiff-appellant, Kathleen Mancini, seeks to hold the City of Tacoma liable for the allegedly tortious actions of its police officers who, in the course of investigating a drug trafficking suspect, mistakenly raided Mancini's apartment. Mancini appeals from the trial court's grant of summary judgment in favor of the City. She contends that the public duty doctrine was not a proper basis for dismissal of her negligence claim; that her intentional tort claims were improperly dismissed; and that the trial court erred in excluding testimony to be given by her treating healthcare providers. Although the trial court was right to dismiss Mancini's claims of defamation and outrage, it erred in dismissing her negligence claim, as well as the remainder of her intentional tort claims. It also erred in excluding the testimony of her treating healthcare providers as a discovery sanction. Therefore, whereas we affirm the dismissal of Mancini's claims of defamation and outrage, we reverse the trial court's grant of summary judgment on the remainder of her claims, reverse the trial court's order excluding the testimony of Mancini's treating healthcare providers, and remand for further proceedings.

I

On January 5, 2011, at approximately 9:30 a.m., Mancini was roused from her sleep when the door to her Federal Way apartment was blown off its hinges with a battering ram. Mancini, who was 63 years old at the time, worked as a nurse at Group Health Hospital. She worked the graveyard shift and had been asleep in her bed after finishing her shift the previous night. Wearing only a nightgown, she emerged from her bedroom to find numerous Tacoma City Police officers dressed in SWAT[2] gear in her hallway with their weapons drawn. The officers shouted "Get down! Get down!" and pushed Mancini, who stands approximately five feet tall, face down onto the floor. They then placed her in handcuffs with her hands behind her back and forcibly led her to the entrance of her apartment.

Although the officers "immediately observed that the inside of the apartment was not as the confidential and reliable informant had described," they still searched Mancini's apartment while she stood outside in handcuffs, wearing only a nightgown, for approximately 30 minutes. They removed clothing from hangers in a closet; they moved a bed in her guestroom; they disturbed a number of religious icons belonging to her deceased mother, which were on a bedside table; they rifled through kitchen cabinets; and they searched her fireplace. While her apartment was being searched, officers who remained with Mancini repeatedly shoved a picture of a man in her face, shouting, "Where is he? Where is he?" Mancini did not recognize the man in the picture.

---

[2] SWAT is an acronym for special weapons and tactics.

Eventually, the officers led Mancini up two flights of stairs to the parking lot of her building. There, they pointed to a Black Dodge Charger and asked, "Is that your car?" Mancini informed the officers that the row of parking where the Charger sat belonged to the building adjacent to hers. She lives in a complex with four separate buildings; she resides in Building B. She told the officers that the owner of the Charger likely lived in Building A.

At that point, the officers took Mancini back to the "breezeway" outside of her front door. Several officers again entered her apartment. Eventually, they emerged and she was released. Officer Kenneth Smith, the officer in charge of the raid, explained that they were seeking a man named "Matt" who was wanted in connection with drugs.

One month before the events detailed above, Smith had received a tip from a confidential informant (CI) that drugs were being sold out of an apartment in which a man named Matt Logstrom resided. Logstrom lived in the same apartment complex as Mancini. Several days before the raid on Mancini's apartment, the CI reported to Smith that she had been in Logstrom's apartment on December 31, 2010, and had seen a sufficient quantity of drugs to indicate that Logstrom was selling drugs. In response to the CI's report, the officers drove the CI by the apartment complex at which Mancini and Logstrom both resided. The CI pointed to Mancini's unit and identified it as the location where she had seen the drugs. Smith then sought and obtained a warrant to search the unit in which Mancini resided. Smith subsequently admitted that, although he usually would have placed a suspected drug dealer's apartment under

- 4 -

surveillance and performed a "controlled buy"[3] prior to seeking a search warrant, he did not employ those procedures in this instance.

After the officer released Mancini, they went to Building A and knocked on the door of the unit that corresponded to the location of Mancini's unit in Building B.[4] Logstrom answered the door and, when the officers asked him to step outside, he complied. At that point, Smith returned to Tacoma and obtained a search warrant for Logstrom's apartment. While waiting for Smith to return, Logstrom was permitted to sit on his living room couch and was not placed in physical restraints. When Smith returned with the warrant, officers searched Logstrom's apartment.

Following this incident, Mancini visited her primary care physician at Group Health Cooperative. Her physician recommended that she seek treatment in the form of massage therapy for a bilateral injury to her shoulder. She was treated 10 times by a massage therapist. She also saw a counselor to assist her in dealing with symptoms of posttraumatic stress disorder (PTSD), which included "[f]ear of noises, fear of men in black, fear of being alone, fear of—I can't even tell you," as well as crying every morning. However, her insurance plan covered only three therapy visits and, when she had exhausted her coverage, she did not seek further treatment for PTSD.

---

[3] Dr. Norm Stamper, a former Chief of the Seattle Police Department, provided a declaration in this case on behalf of Mancini. Therein, he explained that a controlled buy occurs when a CI is provided with marked money, equipped with a wire for audio recording, and sent into a residence to purchase drugs. Once the CI leaves the residence, he or she immediately meets with officers, provides them with the purchased drugs, and explains to them the events that occurred.

[4] Mancini's address was 28652 16th Ave. S. #B1. Logstrom's address was 28617 16th Ave. S. #A1.

On May 18, 2012, Mancini filed a complaint in King County Superior Court. Named as defendants were the City of Tacoma, the Tacoma Police Department, and the chief of the Tacoma Police Department (collectively, the City). Mancini pleaded the following "causes of action": negligence, breach of duty to train and supervise, assault and battery, violation of Washington Constitution article I, section 1,[5] section 3,[6] and section 7,[7] violation of RCW 49.60.030,[8] false imprisonment, defamation, false light, invasion of privacy, and outrage. She sought damages for financial loss, pain and suffering, disability, loss of enjoyment of life, embarrassment, anguish, emotional distress, and PTSD.

The City moved for partial judgment on the pleadings pursuant to CR 12(c). The trial court granted this motion as to Mancini's claims of negligent training and supervision, and as to her constitutional claims, but denied the motion insofar as it sought dismissal of Mancini's claim of discrimination brought pursuant to RCW 49.60.030.

Subsequently, while the parties were engaged in discovery, the City requested a full disclosure of all expert opinions to be offered by Mancini at trial, including expert opinions from treating healthcare providers. In response, Mancini identified three healthcare providers who "have knowledge concerning

---

[5] This section provides, "All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights." WASH. CONST. art. I, § 1.

[6] This section provides, "No person shall be deprived of life, liberty, or property, without due process of law." WASH. CONST. art. I, § 3.

[7] This section provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7.

[8] Otherwise known as the Washington Law Against Discrimination.

- 6 -

[her] injuries, the cause of injuries, the circumstances surrounding the injuries, and the treatment thereof." She did not disclose any details regarding their specific opinions or the bases for their opinions. Unsatisfied with Mancini's disclosure, the City moved to preclude her from offering any medical expert testimony at trial, including expert opinions from treating healthcare providers or, alternatively, moved to compel complete disclosure of all expert opinions to be offered by Mancini at trial, including any expert opinions to be offered by her treating healthcare providers.

On June 20, 2013, the trial court ordered Mancini "to provide a complete disclosure of all experts opinions . . . to be offered at trial," "including treating healthcare providers who will be offering opinion evidence at trial," as well as "any expert opinions to be offered by plaintiff's treating healthcare providers, within 15 days of entry of the Court's order to compel." The trial court also ordered Mancini's treating healthcare providers to produce to the Tacoma City Attorney's Office complete and unredacted copies of Mancini's medical records covering the period between January 1, 2011 and June 20, 2013.

Subsequently, Mancini filed a "supplemental disclosure of expert witnesses." Therein, she included a brief account of the anticipated testimony from her treating healthcare providers. Mancini also moved for reconsideration "regarding plaintiff's responsibility to collect medical records on behalf of the defendants." This motion was denied.

Thereafter, the City again moved to exclude all expert opinion testimony from Mancini's treating healthcare providers. Mancini opposed the City's motion,

asserting that the testimony of her treating healthcare providers did not constitute expert testimony because her treating healthcare providers had not been retained in anticipation of litigation. Mancini argued, "The rule that the defense urges this court to adopt is that every single medical provider is an expert witness . . . . This is the federal rule not the state rule."

On August 2, 2013, the trial court entered an order in which it addressed the City's motion. The trial court's order is recreated, in pertinent part, below.

> 1. That this Court entered an order compelling [Mancini] to disclose any expert opinions to be offered by her treating healthcare providers at trial, and the bases for such opinions, by July 5, 2013; (& denied Reconsideration)
> 2. That [Mancini's] supplemental disclosure, produced in response to the Court's order to compel, does not contain the expert opinions to be offered at trial by her treating healthcare providers, and the bases for such opinions;
> 3. That [Mancini] has failed to comply with this Court's order compelling disclosure of these expert opinions; (or there are none)
> 4. That [Mancini's] failure to comply was willful; (if [Mancini] intends to offer such opinions)
> 5. That [Mancini's] failure to fully disclose the expert opinions to be offered by her treating healthcare providers and the bases for such opinions has substantially prejudiced the [City] in this case; and
> 6. That the Court has considered sanctions less severe than exclusion and has concluded that a lesser sanction would not suffice under the circumstances of this case. Now therefore, it is
> ORDERED, ADJUDGED AND DECREED that [the City's] Motion to Exclude Expert Testimony from [Mancini's] Treating Healthcare Providers is GRANTED; it is further
> ORDERED, ADJUDGED AND DECREED that [Mancini] is precluded from offering any expert testimony from her healthcare providers in this matter.

The trial court explained that its order would be in effect subject to the following caveat: "These Findings & Orders will be in effect only to the extent

Plaintiff does not comply with the Order of June 20, 2013 but now by August 16, 2013. (Due to the Motion for Reconsideration & the Court's extended vacation)."

On August 22, the City moved for summary judgment on all of Mancini's remaining claims.

In opposing the City's summary judgment motion, Mancini submitted a sworn declaration from Stamper, in which Stamper found fault with the conduct of the officers involved in the raid of Mancini's apartment. Stamper stated, "I can unequivocally and emphatically state that hitting the wrong door should never happen" and "is the result of poor supervision, improper training and a lack of due diligence in ascertaining the correct residence." "The actions of the officers involved in the Mancini raid," he continued, "demonstrate a failure to apply basic police standards for service of high risk warrants." One of these standards is "never to trust a confidential informant," which "is exactly what the Tacoma Police involved in the Mancini raid did. They relied exclusively on a confidential informant who herself has been involved in the drug trade." According to Stamper, "appropriate procedure in serving a high risk warrant involving drugs dictates that officers perform a 'controlled buy' prior to any raid." He noted that the Tacoma Police had had ample time to do this.

"Another failure of appropriate policies and procedures," according to Stamper, "is that the Tacoma Police failed to conduct any surveillance on the Mancini apartment prior to the raid." "Typically," he noted, "when someone is dealing drugs out of their residence, drug traffic can be observed as customers come and go to purchase the controlled substance being sold."

Stamper also stated that, in his opinion, the "officers were inside the residence longer than they have acknowledged." "Based upon Ms. Mancini's account, (and their own conflicting reports) the Tacoma police officers on the premises conducted much more than a single sweep of the premises." He also found it "highly unusual . . . that no verified time [for each essential step in the raid] is contained in the incident report other than the time this operation began," such that it "raises doubts about the validity of the officers' accounts."

Stamper concluded, "Because the Tacoma Police officers involved in this raid hit the wrong door, the search warrant obtained by Officer Smith was inappropriately obtained." He also noted that forcible entries of the type that occurred in Mancini's apartment are dangerous to both officers and residents, particularly with the adoption of "increasingly militaristic approaches to law enforcement since the advent of the war on drugs and the events of 9/11." As an observer of dozens of forcible entries, Stamper reported that "forcible entry terrifies and traumatizes residents, whether or not they are the correct target of the raid." He stated that Mancini's "report of trauma certainly fits with the profile of people I have personally observed and spoken with who have experienced forcible raids."

On September 20, 2013, a hearing on the City's summary judgment motion was held. Six days later, the trial court granted summary judgment in favor of the City and dismissed all of Mancini's remaining claims.

Mancini appeals.[9]

II

Mancini contends that the trial court improperly granted summary judgment in favor of the City. As a result, she asserts, her claims of negligence, battery, assault, false imprisonment, defamation, invasion of privacy, and outrage were erroneously dismissed. Although the trial court was right to dismiss Mancini's claims of defamation and outrage, it erred in dismissing the remainder of her aforementioned claims. Of particular note was the dismissal of her negligence claim, which, as we explain herein, is not barred by the public duty doctrine.

"We review a summary judgment order de novo." Lokan & Assocs., Inc. v. Am. Beef Processing, LLC, 177 Wn. App. 490, 495, 311 P.3d 1285 (2013).

---

[9] Mancini does not, in her notice of appeal, designate for appellate review the trial court's order granting partial judgment on the pleadings. Consequently, we do not consider her claims of negligent training and supervision, due process violations, and use of excessive force, which were dismissed as a result of the trial court's order granting partial judgment on the pleadings. See RAP 5.3(a) (a notice of appeal must "designate the decision or part of decision which the party wants reviewed"); Right-Price Recreation, LLC v. Connells Prairie Cmty. Council, 146 Wn.2d 370, 378, 46 P.3d 789 (2002).

Mancini did, in her notice of appeal, designate for appellate review the trial court's order granting summary judgment. Furthermore, in her merits briefing, she assigned error to the CR 56(c) dismissal of her claims of negligence, false imprisonment, invasion of privacy, and outrage. She also provided reasoned argument with citation to relevant authority to support her contention that these claims were improperly dismissed. Accordingly, we consider the propriety of summary adjudication as to each of these claims.

While Mancini did not, in her merits briefing, assign error to the dismissal of her claims of assault, battery, and defamation, she provided reasoned argument with citation to relevant authority to support her contention that these claims were improperly dismissed. The City responded to these arguments. Therefore, notwithstanding Mancini's failure to comply with RAP 10.3(a)(3), we exercise our discretion to consider the propriety of summary adjudication as to each of these claims. Viereck v. Fibreboard Corp., 81 Wn. App. 579, 582-83, 915 P.2d 581 (1996).

Mancini also did not, in her merits briefing, assign error to the dismissal of her claims of false light and violation of RCW 49.60.030. Moreover, she did not provide reasoned argument supported with citation to relevant authority regarding these claims. Therefore, we do not consider the propriety of summary adjudication as to either claim.

"When reviewing an order granting summary judgment, we engage in the same inquiry as the trial court, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party." Brown v. Brown, 157 Wn. App. 803, 812, 239 P.3d 602 (2010). "The motion should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Mayer v. City of Seattle, 102 Wn. App. 66, 75, 10 P.3d 408 (2000). "'A material fact is one upon which the outcome of the litigation depends in whole or in part.'" Brown, 157 Wn. App. at 812 (quoting Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co., 115 Wn.2d 506, 516, 799 P.2d 250 (1990)).

A

We first consider whether the public duty doctrine immunizes the City from being held liable for the alleged negligence of its officers. In doing so, we examine at some length Justice Chambers' concurring opinion in Munich. Nominally, his opinion was a concurrence. However, it was signed by a majority of the members of our state's highest court. Accordingly, it controls our decision in this matter.

In Munich, Justice Chambers observed that the public duty doctrine was a source of "great confusion."

> We (and I include myself) have not been careful in what we have said in past cases. This has given rise to deeply held and greatly divergent views on the doctrine. Some think the public duty doctrine is a tort of its own imposing a duty on any government that gives assurances to someone. Some view it as providing some sort of broad limit on all governmental duties so that governments are never liable unless one of the four exceptions to the public duty

applies, thus largely eliminating duties based on the foreseeability of avoidable harm to a victim.

Munich, 175 Wn.2d at 886 (Chambers, J., concurring).

Justice Chambers set out to dispel this confusion.[10] He began by taking note of the legislature's repeal, in 1961, of State sovereign immunity.

Amended only once . . . , the repeal of state immunity presently

---

[10] This was not the first time Justice Chambers had written separately to address the subject of the public duty doctrine. See Cummins v. Lewis County, 156 Wn.2d 844, 133 P.3d 458 (2006) (Chambers, J., concurring); Babcock, 144 Wn.2d at 795-802 (Chambers, J., concurring). However, prior to Munich, Justice Chambers advocated that the public duty doctrine be either disavowed or limited to its original function.

> However imperfect our system of justice may be, there are certain goals of perfection for which we must strive. Equal justice for all is one of those elusive but desirable goals. We know that all people are not necessarily created equal; some are rich and some are poor, and some are given greater opportunities to develop their natural gifts and talents. The institution of our courts must be the great leveler—where justice is blind and a pauper and a king are judged by the same standard. In our courts of law every party must be treated equally. It is therefore contrary to the general principles of law that one party be granted a special set of rules not afforded to others. The public duty doctrine is one of those special privileges afforded some parties, which is antithetical to the foundations of our law.

Babcock, 144 Wn.2d at 795 (Chambers, J., concurring).

> I would, without reversing any of our prior decisions, simply decide this and all future government liability cases based upon traditional tort law analysis. Traditional tort liability analysis focuses on policy, foreseeability of injury, and proximate cause. The advantages of this approach are several. Traditionally tort duty analysis focuses consideration on the policy of whether the government should owe a duty in a given situation. When a government entity performs a function that is not paralleled in the private sector, such as the issuance of permits and inspection of construction, this Court should analyze the policy concerns unique to those public functions. Traditional tort duty analysis focuses on the class of persons intended to be protected as opposed to the relationship between the plaintiff and government entity. Traditional tort analysis applies the same standard of care to all parties, does not perpetuate the state's immunity, does not conflict with the legislative statutes abrogating governmental immunity and furthers our goal of providing equal justice to all parties.

Babcock, 144 Wn.2d at 800 (Chambers, J., concurring) (footnote omitted).

> The modern public duty doctrine ignores Washington's legislative waiver of sovereign immunity by creating a backdoor version of government immunity unintended by the legislature. It directs this court's attention away from its proper considerations of policy, foreseeability, and proximate cause in favor of a mechanical test that will inevitably lead us to absurd results. The public duty doctrine undercuts legislative intent, is harmful, and should either be abandoned or restored to its original limited function.

Cummins, 156 Wn.2d at 861 (Chambers, J., concurring).

reads as follows: "The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct *to the same extent* as if it were a private person or corporation."

Munich, 175 Wn.2d at 887 (Chambers, J., concurring) (emphasis added) (quoting RCW 4.92.090).[11]

While "[t]here was a time when the king could do no wrong and the sovereign was immune from suit," the doctrine of sovereign immunity "became increasingly unpopular among" members of the judiciary, the legislature, and the academy, many of whom believed that "government should be more accountable for its conduct." Munich, 175 Wn.2d at 887 (Chambers, J., concurring). In repealing sovereign immunity, the legislature determined that the ideal increase in government accountability meant that governments should be held liable for their tortious conduct "'to the same extent'" as private persons or corporations. Munich, 175 Wn.2d at 886 (Chambers, J., concurring) (quoting RCW 4.92.090).

Commencing his analysis with the repeal of sovereign immunity was not merely a show of decorum: Justice Chambers meant to demonstrate that, although the public duty doctrine was created by the judiciary in response to the repeal of immunity, it was not (and could not have been) a judicial retrenchment of the legislature's decision to democratize tort liability. To the contrary, the public duty doctrine was created "to ensure that governments are not," as a consequence of immunity being withdrawn, "saddled with *greater liability* than private actors as they conduct the people's business." Munich, 175 Wn.2d at

---

[11] Justice Chambers also noted the express legislative repeal, in 1967, of immunity for local governments. Munich, 175 Wn.2d at 887 (Chambers, J., concurring).

886 (Chambers, J., concurring) (emphasis added). This was a very real concern, given that "statutes and ordinances imposed duties on governments not imposed upon private persons or corporations." Munich, 175 Wn.2d at 887 (Chambers, J., concurring). On account of this concern, "when a duty was imposed or mandated upon a government entity by statute or ordinance," the court found the public duty doctrine to be a useful tool in determining whether the legislature intended the mandated duty to be "owed to the public in general or to a particular class of individuals." Munich, 175 Wn.2d at 887-88 (Chambers, J., concurring). If application of the public duty doctrine revealed that a mandated duty was owed the public in general, then a breach of that duty would not give rise to liability in tort—a principle that prompted the proverb, "'a duty to all is a duty to no one.'" Munich, 175 Wn.2d at 889-90 (Chambers, J., concurring) (internal quotation marks omitted) (quoting Meaney v. Dodd, 111 Wn.2d 174, 759 P.2d 455 (1988)); cf. Babcock v. Mason County Fire Dist. No. 6, 144 Wn.2d 774, 796, 30 P.3d 1261 (2001) (Chambers, J., concurring) ("Initially the public duty doctrine was simply another way of saying the state did not have a duty to everyone.").

Justice Chambers took pains, however, to explain that in the absence of a *mandated* duty, the public duty doctrine would be of no use in determining the scope of government liability. This was so because, if no duty has been mandated, it is axiomatic that the scope of government liability is, as a result of the repeal of sovereign immunity, coterminous with that of private persons or corporations. See Munich, 175 Wn.2d at 888 (Chambers, J., concurring) ("Because the legislature had declared that governments were to be liable for

their tortious conduct just like private persons or corporations, the public duty doctrine was not applied to duties that governments had in common with private persons."). The public duty doctrine—a judicially-created tool for ascertaining legislative intent—is unable to limit "the government's *common law duties* to only those with whom the government has a special relationship, while extending the liability of private individuals to all those foreseeably harmed by a breach of the same common law duties." Munich, 175 Wn.2d at 892 (Chambers, J., concurring) (emphasis added). Indeed, if the public duty doctrine were, in fact, applied in such fashion, it would "violate the clear declaration of the legislature that governments are to be liable 'to the same extent' as private persons or corporations." Munich, 175 Wn.2d at 892 (Chambers, J., concurring) (quoting RCW 4.92.090; RCW 4.96.010(1)).

As Justice Chambers summarized the Supreme Court's precedents:

> Although we could have been clearer in our analyses, the only governmental duties we have limited by application of the public duty doctrine are duties imposed by a statute, ordinance, or regulation. This court has never held that a government did not have a common law duty solely because of the public duty doctrine.

Munich, 175 Wn.2d at 886-87 (Chambers, J., concurring) (footnote omitted).

Mancini's claim herein is much unlike the claims to which the public duty doctrine has been applied. At common law, a private party had no duty to go to the rescue of another private party. Similarly, "[a]t common law, the police did not have a duty to respond to citizen calls." Cummins v. Lewis County, 156 Wn.2d 844, 870, 133 P.3d 458 (2006) (Chambers, J., concurring). Thus, disputes involving the public duty doctrine have frequently arisen in lawsuits

- 16 -

stemming from calls to 911 seeking rescue or assistance. See, e.g., Munich, 175 Wn.2d 871; Harvey v. Snohomish County, 157 Wn.2d 33, 134 P.3d 216 (2006); Cummins, 156 Wn.2d 844; Bratton v. Welp, 145 Wn.2d 572, 39 P.3d 959 (2002); Beal v. City of Seattle, 134 Wn.2d 769, 954 P.2d 237 (1998); Chambers-Castanes v. King County, 100 Wn.2d 275, 669 P.2d 451 (1983). Mancini brings no such lawsuit. Nor does she claim that the City had a duty to ferret out Logstrom's criminal behavior, that it failed to do so, and that she was injured as a result. Cf. Aba Sheikh v. Choe, 156 Wn.2d 441, 128 P.3d 574 (2006); Bailey v. Town of Forks, 108 Wn.2d 262, 737 P.2d 1257, 753 P.2d 523 (1987).

Instead, Mancini's claim is a straightforward one, grounded in the common law. She claims that she had a common law right in the sanctity of her home and that the City's agents had a duty not to engage in a nonconsensual invasion of her dwelling. This duty, the duty to refrain from invading a private individual's home, whether intentionally (a trespass) or negligently (resulting from the absence of due care) is one of common law origin and applies to all. Her neighbors could not invade her home. The same is true of the City's agents.

In our view, a simple analogy can be drawn. For instance, a private individual driving a car, upon approaching a stop sign, has a duty to slow down and avoid crashing into a vehicle stopped at the stop sign. This duty also applies to a police officer driving a patrol car. And, contrary to the City's position in this litigation, the existence of the duty to stop—and an actionable breach thereof should the officer's vehicle collide with the other vehicle—does not depend on whether the officer's inattention resulted from the officer's munching on a

- 17 -

sandwich (a purely private act) or punching data into the patrol car's computer (a governmental act). In either instance, the officer (and his employer) would be liable in tort to the same extent as would be a private actor. The public duty doctrine would not bar a claim by the driver or owner of the favored vehicle.

Munich compels this analysis. Indeed, from this recent pronouncement of a majority of our Supreme Court, several points are made clear. First, the public duty doctrine is not a grant of immunity or a version of an immunity analysis. Second, the public duty doctrine has never been applied by the Supreme Court to bar a claim alleging the breach of a common law duty by a governmental actor. Third, the public duty doctrine only applies to tort claims premised upon a violation of a statute, ordinance, or regulation when the duty imposed by the statute, ordinance, or regulation was owed to the public in general, as opposed to the claimant in particular. Fourth, if a private person would be liable in tort to the particular claimant, so too would be a governmental actor.

Mancini alleges the breach of a common law duty, applicable to private actors and governmental actors alike. The duty was owed directly to her, as the occupant of the home. It was not a duty owed to society in general.

The public duty doctrine is not a judicially-created immunity. It does not bar a common law claim brought by the person to whom the breached duty was owed. The trial court erred in dismissing Mancini's negligence claim.[12]

---

[12] The City attempts to reformulate Mancini's claim as being one for the nonexistent cause of action of negligent investigation. Mancini is correct in rejecting this reformulation. Mancini does not allege that a negligent investigation led to her being wrongly considered a

B

Having addressed Mancini's negligence claim, we now consider the propriety of summary adjudication as to her intentional tort claims, which include assault and battery, false imprisonment, defamation, invasion of privacy, and outrage. We conclude that Mancini failed to establish a prima facie case of defamation and of outrage and, consequently, we affirm the dismissal of these two claims. However, the trial court erred in dismissing Mancini's claims of assault and battery, false imprisonment, and invasion of privacy; thus, we reverse the dismissal of these claims.

i

Mancini first contends that the trial court erred in dismissing her claims of assault and battery. She maintains that genuine issues of material fact exist regarding the reasonableness of the force that was used against her. We agree.

"A battery is '[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or apprehension that such a contact is imminent.'" McKinney v. City of Tukwila, 103 Wn. App. 391, 408, 13 P.3d 631 (2000) (alteration in original) (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 9, at 39 (5th ed. 1984)). "An assault is any act of such a nature that causes apprehension of a battery." McKinney, 103 Wn. App. at 408.

While, in general, "a police officer making an arrest is justified in using

suspect in a crime. Nor does she allege that a negligent investigation allowed the true criminal to cause her harm. The City's attempt to reformulate her claim is off the mark.

sufficient force to subdue a prisoner," an officer "becomes a tortfeasor and is liable as such *for assault and battery* if unnecessary violence or excessive force is used in accomplishing the arrest." Boyles v. City of Kennewick, 62 Wn. App. 174, 176, 813 P.2d 178 (1991). An early description of the standard for determining whether excessive force was used, which has since become known as the "test of reasonableness," has continued validity.

> In this state, where the common law rule prevails, a police officer is justified in making an arrest when he has reasonable ground to believe, and does believe, that a crime is being committed, and, having the right to make the arrest, he has the right to use that degree of force the circumstances of the case warrant; that is to say, if the crime is a misdemeanor, he may use the force the law permits in making arrests for misdemeanors; and if it be a felony, he may use the force the law permits in making arrests for felony. When, therefore, an officer is called upon to answer for a claimed unlawful arrest, or for excessive use of force in making a lawful arrest, he has the right to show the circumstances surrounding the transaction, and the impression these circumstances make on his mind, and to have the jury charged on his theory of the case; unless, of course, the circumstances were such that there could be no two opinions concerning it.

Coldeen v. Reid, 107 Wash. 508, 516, 182 P. 599 (1919).

A more recent articulation of the "test of reasonableness" instructs courts to consider the "(1) severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Staats v. Brown, 139 Wn.2d 757, 774, 991 P.2d 615 (2000) (citing Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

Viewed in the light most favorable to Mancini, the trial court record shows that Mancini was menaced with firearms, shouted at, pushed face down on the

floor, and placed in handcuffs, before being picked up off of the floor and forcibly led to the entrance of her apartment. Although Officer Smith immediately realized that Mancini's apartment did not match the description given by the CI, Mancini was kept in restraints for 30 minutes, during which time officers repeatedly shoved a picture of a man (who she did not recognize) in her face, shouting, "Where is he? Where is he?" Additionally, the officers led Mancini, who was still handcuffed, up two flights of stairs to the parking lot of her building before leading her back to her apartment and, eventually, removing the handcuffs. Mancini was, at the time, 63 years old, and stood approximately five feet tall. She did not, at any point, resist the use of force against her and she was responsive to all of the questions directed to her.

In view of these facts, we decline to hold, as a matter of law, that the force used against Mancini was reasonable. Taken in the light most favorable to Mancini, the evidence is sufficient to create a genuine issue of material fact on the question of whether the officers' use of force was reasonable under the circumstances. The answer to this question must come from a trier of fact. Accordingly, we reverse the dismissal of her claims of assault and battery.

ii

Mancini next contends that the trial court erred in dismissing her claim of false imprisonment. She argues that a reasonable trier of fact could conclude that she was confined beyond a reasonable period of time. We agree.

"The gist of an action for false arrest or false imprisonment is the unlawful violation of a person's right of personal liberty or the restraint of that person

- 21 -

without legal authority." Bender v. City of Seattle, 99 Wn.2d 582, 591, 664 P.2d 492 (1983). "[S]uch restraint or imprisonment may be accomplished by physical force alone, or by threat of force, or by conduct reasonably implying that force will be used." Kilcup v. McManus, 64 Wn.2d 771, 777, 394 P.2d 375 (1964). "[T]he plaintiff in a false imprisonment claim must show merely that the defendant intended to confine the plaintiff, not that the defendant intended to do so without legal authority." Stalter v. State, 113 Wn. App. 1, 15, 51 P.3d 837 (2002), rev'd in part on other grounds, 151 Wn.2d 148, 86 P.3d 1159 (2004).

"Although probable cause is generally a defense to false imprisonment, lawful arrest does not necessarily 'foreclose consideration of facts surrounding the subsequent imprisonment.'" Stalter, 113 Wn. App. at 15 (citation omitted) (quoting Kellogg v. State, 94 Wn.2d 851, 854, 621 P.2d 133 (1980); Tufte v. City of Tacoma, 71 Wn.2d 866, 870, 431 P.2d 183 (1967)). Thus, "a lawful imprisonment following proper arrest may under some circumstances become unlawful." Tufte, 71 Wn.2d at 870; see Stalter, 113 Wn. App. at 15 ("an initial justification for the detention does not necessarily shield the County from claims of false imprisonment based on the erosion of that justification over time").

Viewed in the light most favorable to Mancini, the evidence shows that, although Officer Smith immediately observed that the inside of the apartment was not as the CI had described, Mancini was nevertheless kept in confinement for approximately 30 minutes. It is true that the officers were in possession of a warrant to search the premises; however, that fact did not authorize the confinement of Mancini beyond a reasonable period of time. We hold that a jury

could, based on the evidence before the trial court on summary judgment, find that Mancini was kept in confinement beyond a reasonable period of time. Therefore, we reverse the dismissal of her false imprisonment claim and remand for trial.

iii

Mancini next contends that the trial court erred in dismissing her claim of defamation. She maintains that the act of parading her "into a parking lot in full view of a major thoroughfare and the adjoining apartment buildings and condominiums" while in handcuffs was defamatory. Reply Br. of Appellant at 17. Her contention is unavailing.

"When a defendant in a defamation action moves for summary judgment, the plaintiff has the burden of establishing a prima facie case on all four elements of defamation: falsity, an unprivileged communication, fault, and damages." LaMon v. Butler, 112 Wn.2d 193, 197, 770 P.2d 1027 (1989). "Once the plaintiff has established a prima facie case of defamation, the defendant can raise either an absolute or qualified privilege to defend against liability for defamatory statements." Momah v. Bharti, 144 Wn. App. 731, 741, 182 P.3d 455 (2008). "'An absolute privilege or immunity is said to absolve the defendant of all liability for defamatory statements. A qualified privilege, on the other hand, may be lost if it can be shown that the privilege has been abused.'" Momah, 144 Wn. App. at 741 (quoting Bender, 99 Wn.2d at 600). Our Supreme Court has previously ruled that "the release of information to the press and public by police officers" is subject to a "qualified privilege." Bender, 99 Wn.2d at 601.

- 23 -

In order to establish an abuse of a qualified privilege, there must be "proof of knowledge or reckless disregard as to the falsity of a statement"—in other words, "actual malice." Bender, 99 Wn.2d at 559, 601-02. Furthermore, "proof of an abuse of a qualified privilege must be established by clear and convincing evidence, not simply by a preponderance of the evidence." Bender, 99 Wn.2d at 601 (adopting rule from RESTATEMENT (SECOND) OF TORTS § 600, at 288 (1977)); accord Momah, 144 Wn. App. at 742 ("Actual malice must be shown by clear and convincing proof of knowledge or reckless disregard as to the falsity of a statement."). "Thus, the showing that a privilege applies raises both the standard of fault and burden of proof, even where the plaintiff is a private individual."[13] Momah, 144 Wn. App. at 742.

Mancini maintains that that the officers acted negligently. Negligence, however, is not the applicable standard of fault. Owing to the officers' qualified privilege, Mancini must show "actual malice" by clear and convincing evidence. Yet, she fails even to assert that she has satisfied this exacting burden of production, and our review of the trial court record reveals that she has not, in fact, met her burden.[14] Consequently, we hold that the trial court did not err in dismissing her defamation claim.

iv

Mancini next contends that the trial court erred in dismissing her claim of

---

[13] "When the standard of fault is negligence, the applicable burden of proof is preponderance of the evidence." Momah, 144 Wn. App. at 741.

[14] We need not—and, therefore, do not—reach the issue of whether a publication occurred. See McKinney, 103 Wn. App. at 409-10 (concluding that the issue of publication need not be reached where the nonmovant failed to establish the element of fault).

invasion of privacy by intrusion on seclusion. We agree.

Our Supreme Court has made clear that "the common law right of privacy exists in this state and that individuals may bring a cause of action for invasion of that right." Reid v. Pierce County, 136 Wn.2d 195, 206, 961 P.2d 333 (1998). "A person may sue the government for common law privacy invasion if it intentionally intrudes upon his or her solitude, seclusion, or private affairs." Youker v. Douglas County, 178 Wn. App. 793, 797, 327 P.3d 1243, review denied, 180 Wn.2d 1011 (2014). But cf. Reid, 136 Wn.2d at 213-14 (refusing to create a constitutional cause of action for governmental privacy invasions).

The following elements must be proved by a preponderance of the evidence to establish a prima facie claim of invasion of privacy: (1) an intentional intrusion, physically or otherwise, upon the solitude or seclusion of plaintiff, or her private affairs; (2) a legitimate and reasonable expectation of privacy with respect to that matter or affair; (3) an intrusion that would be highly offensive to a reasonable person; and (4) damage proximately caused by the defendant's conduct. John Doe v. Gonzaga Univ., 143 Wn.2d 687, 705-06, 24 P.3d 390 (2001), rev'd on other grounds, 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). "'[T]he intruder must have acted deliberately to achieve the result, with the certain belief that the result would happen.'" Youker, 178 Wn. App. at 797 (alteration in original) (quoting Fisher v. Dep't of Health, 125 Wn. App. 869, 879, 106 P.3d 836 (2005)).

Upon entering Mancini's apartment, Officer Smith—the leader of the raid and the liaison between the CI and law enforcement—immediately recognized

- 25 -

that the apartment did not match the description given by the CI. While Smith claimed the officers only conducted a "brief protective sweep" of the apartment, Mancini alleged that her apartment was searched twice during the 30 minutes she spent in confinement. A reasonable trier of fact could conclude, based on this evidence, that the officers intentionally intruded upon Mancini's seclusion by searching her apartment several times, despite quickly realizing that they had entered the wrong apartment.

The City concedes that there was an intrusion into Mancini's private affairs. However, it argues that the search warrant "superseded [Mancini's] reasonable expectation of privacy" and, therefore, the entry "is not actionable as an invasion of privacy." Br. of Resp't at 26. The City does not cite any authority in support of this position.

We decline to rule that the existence of a warrant forecloses, as a matter of law, a claim of invasion of privacy. As previously explained, the existence of a search warrant does not foreclose, as a matter of law, a claim of false imprisonment. Rather, because probable cause to detain may be eroded over time, subsequent circumstances will, in some cases, necessitate consideration by the trier of fact. Probable cause to search, even when written on a warrant, is not written in stone. Of course, the existence of the warrant may prove difficult for Mancini to overcome insofar as her burden of *persuasion* is concerned. However, the warrant, in and of itself, does not prevent Mancini from presenting her case to a trier of fact. Because we conclude that a reasonable trier of fact could determine that the officers invaded Mancini's privacy, we reverse the

dismissal of this claim.

V

Mancini next contends that the trial court erred in dismissing her claim of outrage. We disagree.

"To establish a claim for the tort of outrage—also known as intentional infliction of emotional distress—the plaintiff must show that (1) he or she suffered severe emotional distress; (2) the emotional distress was inflicted intentionally or recklessly, but not negligently; (3) the conduct complained of was outrageous and extreme; and (4) he or she personally was the subject of the outrageous conduct." Grange Ins. Ass'n v. Roberts, 179 Wn. App. 739, 753-54, 320 P.3d 77 (2013) (footnote omitted), review denied, 180 Wn.2d 1026 (2014). "'[I]t is not enough that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" Birklid v. Boeing Co., 127 Wn.2d 853, 868, 904 P.2d 278 (1995) (internal quotation marks omitted) (quoting Grimsby v. Samson, 85 Wn.2d 52, 59, 530 P.2d 291 (1975)). Instead, the conduct "must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Grange, 179 Wn. App. at 754 (internal quotation marks omitted) (quoting Reid, 136 Wn.2d at 202). "The question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to determine if reasonable minds could differ on

whether the conduct was sufficiently extreme to result in liability." Dicomes v. State, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989).

The evidence, when viewed in the light most favorable to Mancini, establishes that she was needlessly subjected to both mental and physical distress. Nevertheless, no reasonable trier of fact could find the officers' actions to "be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Grange, 179 Wn. App. at 754 (internal quotation marks omitted) (quoting Reid, 136 Wn.2d at 202). As this string of superlatives suggests, outrage is a tort reserved for the most egregious instances of wrongdoing. See, e.g., Kloepfel v. Bokor, 149 Wn.2d 192, 194-95, 66 P.3d 630 (2003) (elements of outrage met when defendant, who was under a no-contact order, threatened to kill his ex-girlfriend, threatened to kill her boyfriend, watched her home, called her home 640 times, called her work 100 times, and called the homes of her male friends numerous times). No reasonable trier of fact could find that the mistreatment suffered by Mancini meets the high standard detailed herein. Accordingly, we hold that the trial court did not err in dismissing Mancini's claim of outrage.

III

Maninci next contends that the trial court, in its August 2, 2013 order, erroneously excluded witness testimony to be given by her treating healthcare providers at trial. According to Mancini, the imposition of this discovery sanction was premised on a misapplication of the superior court civil rule governing

witness disclosure requirements. Furthermore, she asserts, the harsh sanction of excluding witness testimony was not adequately supported by the requisite findings set forth by our Supreme Court in Burnet v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1997).

While the record, as designated on appeal, does include an order entered on August 2, 2013, in which the trial court purported to be excluding witness testimony from Mancini's treating healthcare providers, the effect of the order was expressly conditioned on a subsequent failure by Mancini to comply with a prior order within a certain period of time following entry of the order.[15] It is not clear from the record whether this condition, in fact, occurred. Nonetheless, because we reverse in part and remand for further proceedings, we choose to address this issue as presented to us by Mancini, which is to say that we assume that the August 2 order became effective.

## A

Washington appellate courts "review a trial court's sanctions for discovery violations for abuse of discretion." Blair v. TA-Seattle E. No. 176, 171 Wn.2d 342, 348, 254 P.3d 797 (2011). An abuse of discretion occurs when a decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006). A decision rests on untenable grounds or is based on untenable reasons if the trial court applies the wrong legal standard. Mayer, 156 Wn.2d at 684. Questions of

---

[15] As noted, the court stated, "These Findings & Orders will be in effect only to the extent Plaintiff does not comply with the order of June 20, 2013 but now by August 16, 2013. (Due to the Motion for Reconsideration & the Court's extended vacation)."

law are reviewed de novo. Mayer, 156 Wn.2d at 684.

As our Supreme Court has made clear: "[T]he law favors resolution of cases on their merits." Burnet, 131 Wn.2d at 498 (alteration in original) (quoting Lane v. Brown & Haley, 81 Wn. App. 102, 106, 912 P.2d 1040 (1996)). Because of this, the court has cabined a trial court's discretion to exclude witness testimony as a means of sanctioning discovery violations. Jones v. City of Seattle, 179 Wn.2d 322, 338, 314 P.3d 380 (2013); Mayer, 156 Wn.2d at 688; Burnet, 131 Wn.2d at 494. Consequently, prior to excluding witness testimony, "the trial court must explicitly consider whether a lesser sanction would probably suffice, whether the violation at issue was willful or deliberate, and whether the violation substantially prejudiced the opponent's ability to prepare for trial." Jones, 179 Wn.2d at 338 (citing Burnet, 131 Wn.2d at 494).

Discovery sanctions should be "proportional to the nature of the discovery violation and the surrounding circumstances" of the case. Rivers v. Wash. State Conf. of Mason Contractors, 145 Wn.2d 674, 695, 41 P.3d 1175 (2002). Generally, "the court may impose only the least severe sanction that will be adequate to serve its purpose in issuing a sanction." Teter v. Deck, 174 Wn.2d 207, 216, 274 P.3d 336 (2012). "We have also said that 'it is an abuse of discretion to exclude testimony as a sanction [for noncompliance with a discovery order] absent any showing of intentional nondisclosure, willful violation of a court order, or other unconscionable conduct." Burnet, 131 Wn.2d at 494 (emphasis added) (alteration in original) (internal quotation marks omitted) (quoting Fred Hutchinson Cancer Research Ctr. v. Holman, 107 Wn.2d 693, 706, 732 P.2d 974

(1987)). As made clear, only "unconscionable conduct" can give rise to the exclusion of testimony as a discovery sanction.

Moreover, the trial court must make a proper record of its consideration. While the court may enter an order imposing a discovery sanction without oral argument or a colloquy on the record, the order (or a contemporaneous record) must contain findings on the Burnet factors of willfulness, prejudice, and consideration of a lesser sanction. Teter, 174 Wn.2d at 216-17. To allow for meaningful review, the findings themselves must explain the court's reasoning for reaching its conclusions. Burnet, 131 Wn.2d at 494. In addition, the order must "be supportable *at the time it was entered.*" Blair, 171 Wn.2d at 350.

As a result of Burnet—and subsequent Supreme Court authority further refining and applying that decision—there exists a presumption that witnesses will be allowed to testify and that they shall not be excluded in situations in which the applicable rule, or its application, is unclear. Such was the case herein.

B

Mancini asserts that she was required to disclose her treating healthcare providers as lay witnesses. Therefore, she argues, the trial court erred by ordering her to disclose to the City the expert witness testimony to be given by her treating healthcare providers at trial.

Both the King County Local Civil Rules and the Superior Court Civil Rules impose certain disclosure requirements with regard to both lay witness testimony and expert witness testimony.

The civil rules provide, in pertinent part, for the following:

(5) *Trial Preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subsection (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows: . . . .

. . . .

(7) *Discovery From Treating Health Care Providers.* The party seeking discovery from a treating health care provider shall pay a reasonable fee for the reasonable time spent in responding to the discovery.

CR 26(b).

The King County local rules provide, in pertinent part, for the following:

**(k) *Disclosure of Primary Witnesses. Required Disclosures.***
**(1) Disclosure of Primary Witnesses.** Each party shall, no later than the date for disclosure designated in the Case Schedule, disclose all persons with relevant factual or expert knowledge whom the party reserves the option to call as witnesses at trial.
**(2) Disclosure of Additional Witnesses.** Each party shall, no later than the date for disclosure designated in the Case Schedule, disclose all persons whose knowledge did not appear relevant until the primary witnesses were disclosed and whom the party reserves the option to call as witnesses at trial.
**(3) Scope of Disclosure.** Disclosure of witnesses under this rule shall include the following information:
**(A) All Witnesses.** Name, address, and phone number.
**(B) Lay Witnesses.** A brief description of the witness' relevant knowledge.
**(C) Experts.** A summary of the expert's opinions and the basis therefore and a brief description of the expert's qualifications.
**(4) Sanctions.** Failure to comply with this rule or the court's Order Setting Case Schedule may result in sanctions, including the exclusion of witnesses.

KCLR 26(k).

"[L]ocal rules may not be applied in a manner inconsistent with the civil rules." Jones, 179 Wn.2d at 344. Whereas the King County local rules address expert witness testimony, they do not specifically address treating healthcare

provider testimony. The civil rules, however, address expert witness testimony and treating healthcare provider testimony in separate subsections of Rule 26. This indicates that Rule 26 does not view the two to be coextensive. In other words, under the civil rules, not all prospective testimony of treating healthcare providers is to be considered prospective expert testimony.

Case law confirms this. Referring to former CR 26(b)(4), now enumerated as CR 26(b)(5), we previously announced that, "[u]nder CR 26(b)(4) the distinction between an expert who is testifying as a fact witness and an expert witness who is testifying as a CR 26(b)(4) expert is whether the facts or opinions possessed by the expert were obtained for the specific purpose of preparing for litigation." Peters v. Ballard, 58 Wn. App. 921, 927, 795 P.2d 1158 (1990). Thus, in that case, with respect to a witness, Dr. Kranz, who had provided healthcare to plaintiff Peters, we held that, "Dr. Kranz's knowledge and opinions were derived from his role as Peters' subsequent treating physician, not in anticipation of litigation or for trial. Accordingly, Dr. Kranz should be treated as any other witness." Peters, 58 Wn. App. at 930.

This distinction was again recognized in a later decision, in which the varied legal bases for the prohibition against ex parte contact with such witnesses was discussed. "Ex parte contact with an opposing party's expert medical witness is prohibited by court rule. Ex parte communication with a treating physician who testifies not as an expert but as a fact witness is prohibited as a matter of public policy." Rowe v. Vaagen Bros. Lumber, Inc., 100 Wn. App. 268, 278-79, 996 P.2d 1103 (2000) (citations omitted).

- 33 -

It was on this basis—the recognized distinction between expert witnesses and treating healthcare providers—that Mancini took the position that the local rules called for her to disclose her treating healthcare providers as lay witnesses, as opposed to expert witnesses.

The City disagreed and sought relief from the trial court. It countered that opinion testimony from health care providers constituted expert testimony. In support of its contention, the City cited ER 702, which provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

This rule, however, is a rule of evidentiary admissibility, not a rule regarding discovery. The applicable rules, CR 26(b) and KCLR 26(k) are not fully harmonious. If in conflict, the local rule must give way to the Supreme Court's rule. Jones, 179 Wn.2d at 344. This supports Mancini's position.

Having said all this, we readily acknowledge that, in any given case, the superior court has inherent authority to provide for and direct discovery. Mayer, 156 Wn.2d at 689; State v. Mecca Twin Theater & Film Exch., Inc., 82 Wn.2d 87, 90, 507 P.2d 1165 (1973). Accordingly, we do not base our decision on the superior court's incorrect resolution of the conflict between the state and local rules. The trial court had the authority to rule as it did based on its inherent authority, the wording of the various rules notwithstanding. Instead, we analyze whether the court, in its August 2 order excluding testimony from Mancini's

treating healthcare providers, correctly determined that the harsh sanction of witness exclusion was justified in this instance.

C

We conclude that the trial court erred in determining that the harsh sanction of witness exclusion was justified in this instance. Although the court, in its August 2 order, invoked the language of the requisite factors that comprise the Burnet inquiry, it failed to adequately explain the bases for its findings. In the absence of such an explanation, we are unable to conclude that the severity of the sanction imposed by the court was tailored to the nature of the prejudice suffered by the City as a consequence of Mancini's discovery violation.

A fundamental purpose of the discovery process is to prepare both parties for trial. When this purpose is intentionally frustrated by one party, such that another party is prejudiced in its ability to prepare for trial, there is an established preference in favor of curing the resultant prejudice, as opposed to compromising the claims or defenses of either party at trial. E.g., Burnet, 131 Wn.2d at 498. This preference helps to explain our Supreme Court's insistence that the severity of a discovery sanction imposed by a trial court must be tailored to the nature of the prejudice caused by the discovery violation being sanctioned. See Jones, 179 Wn.2d at 345 ("Burnet requires that a trial court consider lesser sanctions 'that could have advanced the purposes of discovery and yet compensated [the opposing party] for the effects of the . . . discovery failings.'" (alterations in original) (quoting Burnett, 131 Wn.2d at 497)); Teter, 174 Wn.2d at 216 ("the court may impose only the least severe sanction that will be adequate to serve its

purpose in issuing a sanction"); Rivers, 145 Wn.2d at 695 ("the sanction imposed should be proportional to the nature of the discovery violation and the surrounding circumstances").

In its August 2 order, the trial court found that Mancini had willfully violated a discovery order, that the City had been substantially prejudiced as a result, and that the court had considered but ultimately rejected lesser sanctions than witness exclusion. However, because the court did not provide an explanation of the nature of the prejudice to the City caused by the discovery violation, we are unable to determine that exclusion was the least severe sanction adequate to serve the court's purpose in sanctioning Mancini.[16]

Tellingly, the court's findings that lesser sanctions would not have sufficed was entered while discovery was still ongoing. Ordinarily, under such circumstances, any prejudice to a defendant's ability to prepare for trial could be cured by sanctions less severe than witness exclusion. Cf. Jones, 179 Wn.2d at 346 ("prejudice" finding satisfied Burnet requirements where trial court excluded testimony that had been offered for the first time only after trial had begun). For instance, if the trial court in this matter had found that the City was prejudiced in that it lacked sufficient information with which to examine Mancini's witnesses at trial, the court could have ordered the City to depose Mancini's witnesses, but at

---

[16] The trial court's findings are deficient in two important regards. First, the court did not set out in what way Mancini's discovery disclosures were insufficient. Specific findings on this question would inform any finding of prejudice. Second, the court did not set out the nature of the prejudice to the City. Specifically, it is not clear whether the trial court believed that the City's ability to adequately depose Mancini's witnesses was compromised or whether it believed that the City planned to try the case without ever deposing Mancini's witnesses, and that, accordingly, the deficient disclosures prejudiced the City's ability to deal (at trial) with the testimony of Mancini's witnesses.

Mancini's expense.  See Mayer, 156 Wn.2d 677 (trial courts may impose monetary compensatory discovery sanctions without conducting a Burnet analysis).  If the court had instead found that the City was prejudiced in that it did not have sufficient information with which to depose Mancini's witnesses, the court could have ordered the City to depose Mancini's witnesses twice: the first at Mancini's expense (and limited to discovering those facts that the court found were missing from Mancini's disclosures), the second at the City's expense.  In either scenario, any prejudice to the City would have been cured without compromising Mancini's presentation of her claims at trial.

In view of the foregoing, we conclude that the sanction imposed by the trial court in its August 2 order was too severe.  Not only did the court fail to explain the nature of the prejudice to the City, it failed to explain why, under such circumstances, lesser sanctions—such as those detailed herein—would have been insufficient to cure the prejudice to the City.[17]  Because the trial court's order did not evidence that the severity of the sanction imposed was tailored to the nature of the prejudice suffered, the usual presumption that witnesses will be allowed to testify was not overcome.  As such, the order must be vacated.[18]

---

[17] Supreme Court precedent makes clear that under Burnet and its progeny, the party wronged by the discovery violation is not entitled to the sanction it prefers.  It is only entitled to the least sanction available to remedy the prejudice identified.

[18] Mancini contends that the trial court abused its discretion when it ordered her to obtain her records from Group Health and provide them to the City.  However, the trial court's unambiguous order directed Mancini's "treating healthcare providers, Elizabeth Daniels, MA, and Group Health, are hereby ordered to produce to the Tacoma City Attorney's Office complete and unredacted copies of [Mancini's] medical records for the period of January 1, 2001 to the present."  It is apparent, therefore, that Mancini's contention is based on a misreading of the trial court's order.  No appellate relief is warranted as Mancini was not directed to do anything.  We

No. 71044-3-I/38

IV

Mancini requests an award of attorney fees and costs on appeal. She does so in a single sentence: "Appellants' counsel requests attorneys fees and costs pursuant to RAP 18.1." Br. of Appellant at 48.

Attorney fees and costs will be awarded on appeal if (1) applicable law grants a party the right to recover reasonable attorney fees on review and (2) the party devotes a section of its opening brief to the request for fees. RAP 18.1. However, we will deny a request for attorney fees and costs where the requesting party devotes to the issue only one sentence in its brief's concluding paragraph. See, e.g., Wilson Court Ltd. P'ship v. Tony Maroni's, Inc., 134 Wn.2d 692, 710-11 n.4, 952 P.2d 590 (1998). "Argument and citation to authority are required" to advise us of the appropriate ground for an award of fees and costs; the parties must make "more than a bald request for attorney fees." Wilson Court, 134 Wn.2d at 710-11 n.4.

Mancini devotes only one sentence in her opening brief's concluding paragraph to her request for fees and costs and fails to cite to any authority in support of the request. Accordingly, we deny her request.[19]

---

will not speculate as to the trial court's options should either Daniels or Group Health (who are not parties to this action) refuse to comply.

[19] Mancini's request that we remand this matter to a different trial judge is also denied.

Affirmed in part, reversed in part and remanded.

We concur: